# EXHIBIT A

BROWN, JONATHAN  *  September 18, 2018

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA


JONATHAN BROWN                )
                              )
          Plaintiff           )   Case No.
                              )   3:17-cv-00384-BAJ-RLB
VS.                           )
                              )   SECTION: BATON ROUGE
PRAXAIR, INC., ET AL          )
                              )
          Defendant.          )



*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

JONATHAN BROWN

SEPTEMBER 18, 2018

VOLUME 1

*******************************************************



     ORAL DEPOSITION of JONATHAN BROWN, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on September 18, 2018, from 9:24 a.m. to 12:30
p.m., before Denyce M. Sanders, CSR, RDR, CRR, CCR
(LA), in and for the State of Texas, recorded by
machine shorthand, at the offices of LITTLER
MENDELSON, P.C., 1301 McKinney, Suite 1900, Houston,
Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto; signature having been waived.

APP. 0000001

BROWN, JONATHAN  *  September 18, 2018

Page 2

```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3

 4         THE JOHNSON LAW GROUP, PLC
           4880 Bluebonnet Boulevard, Suite A
 5         Baton Rouge, Louisiana 70807
           Mr. Willie G. Johnson
 6         222.717.7070
           wjohnson@jlglegal.com
 7         Mr. Derek E. Elsey
           delsey@jlglegal.com
 8

 9  FOR THE DEFENDANTS:

10         LITTLER MENDELSON, P.C.
           2001 Ross Avenue, Suite 1500
11         Dallas, Texas 75201
           Mr. Ryan Griffitts
12         214.880.8100
           rgriffitts@littler.com
13

14

    VIDEOGRAPHER:
15

           Eric Palacios
16

17  ALSO PRESENT:

18         Ms. Vanjia Thomas

19

20

21

22

23

24

25
```

APP. 0000002

BROWN, JONATHAN  *  September 18, 2018

```
                                                      Page 3
 1                           INDEX
 2            ORAL AND VIDEOTAPED DEPOSITION OF
 3             JONATHAN BROWN, SEPTEMBER 18, 2018
 4                                               Page
 5     APPEARANCES..............................    2
 6     BY MR. GRIFFITTS.........................    7
 7
 8
 9     REPORTER CERTIFICATION ..................  170
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BROWN, JONATHAN  *  September 18, 2018

Page 8

1      Q.      All right.  And you understand we're
2   here to take your deposition in a lawsuit that you
3   filed?
4      A.      Yes.
5      Q.      And you understand you're under oath?
6      A.      Yes.
7      Q.      All right.  Mr. Brown, you were hired by
8   Praxair back in 2012; is that right?
9      A.      That's correct.
10     Q.      And do you recall who all you
11  interviewed with?
12     A.      Repeat that question.
13     Q.      Do you recall who you interviewed with
14  for that job?
15     A.      Yes.  I think the HR person that was
16  there, her name was Betty, if I'm not mistaken.
17     Q.      Okay.
18     A.      She was in Vanjia's position, I believe.
19     Q.      She was in Vanjia's position?
20     A.      Yeah.
21     Q.      Okay.
22     A.      A black female.  She left shortly
23  afterwards.
24     Q.      Okay.
25     A.      James Willis, I think he was there.  I'm

BROWN, JONATHAN  *  September 18, 2018

Page 9

1   trying to recall if he was there by phone.  Jim

2   Price -- James Price, he was there.

3        Q.     Okay.

4        A.     And those are the only ones I remember.

5        Q.     Okay.  You don't dispute, do you, that

6   Mr. Willis was ultimately the person that made the

7   decision to hire you?

8        A.     I think so.

9        Q.     He was?

10       A.     I think he was.

11       Q.     Okay.  And I take it Mr. Willis treated

12   you respectfully during that interview?

13       A.     During that interview, yes.

14       Q.     Yeah.

15              And, in fact, when you started to

16   work for Mr. Willis, y'all had a good working

17   relationship; is that true?

18              MR. JOHNSON:  Object to form.

19       A.     Great.  Great working relationship when

20   we started.

21       Q.     (BY MR. GRIFFITTS)  All right.  And one

22   of the things that -- I mean, you reported directly

23   to him; is that true?

24       A.     That's correct.

25       Q.     So he performed your annual performance

BROWN, JONATHAN  *  September 18, 2018

Page 20

1      A.      Uh-huh.

2      Q.      -- it says that, "Jonathan has taken on

3   a challenging role, stepping into a site with both

4   organizational and equipment challenges."

5               Did I read that correctly?

6      A.      That's correct.

7      Q.      And Geismar was an older facility, was

8   it not?

9      A.      Very old, correct.  Yes.

10     Q.      And so because it was older, that can

11  create some challenges from a maintenance

12  perspective; is that right?

13     A.      Yes.

14              MR. JOHNSON:  Object to form.

15     Q.      (BY MR. GRIFFITTS)  Okay.  He writes,

16  then, "I am confident that Jonathan is the right man

17  for the job to bring Geismar to a level of

18  performance to be proud of."

19              Did I read that portion correctly?

20     A.      Yes.

21     Q.      All right.  What did you think about his

22  comments in this review?

23     A.      I thought it was positive, in a sense.

24  As you stated earlier, it was a very challenging

25  site.  I had my hands full.  I walked into the job.

BROWN, JONATHAN  *  September 18, 2018

Page 21

1   I saw what all they had there.  And I'll be honest

2   with you, I started to walk away from it because it

3   was way too much.

4        Q.     Okay.

5        A.     But it was a challenge for me.  Given my

6   background in the military, I'm used to challenges.

7   I was willing to take it on, and I stepped in and

8   started making an immediate impact.

9        Q.     Okay.

10       A.     And he thought I was doing a good job.

11       Q.     Okay.  And so you thought at least --

12   overall, you thought his review in 2012 was a fair

13   assessment?

14            MR. JOHNSON:  Object to form.

15       A.     A good assessment.  I wouldn't say

16   "fair," based on what I told you.

17       Q.     (BY MR. GRIFFITTS)  Okay.

18       A.     The challenges that I had to face with

19   an old plant, lack of leadership at the site.

20   Because I was the only leader for all of

21   maintenance.

22       Q.     Okay.  Well, let me put it another way.

23            You didn't think, in 2012, that

24   Mr. Willis was discriminating against you based on

25   your race with regard to anything that he put in his

BROWN, JONATHAN  *  September 18, 2018

Page 22

1    performance review?

2         A.    No.  Not in 2012, no.

3         Q.    All right.  Thank you.

4               You mentioned that the job, when you

5    showed up at it, was way too much and that you

6    started to walk away.  What did you mean by that?

7         A.    Well, coming from a military background,

8    you have three to five technicians per foreman, per

9    lead tech, per supervisor.  That's a given.

10   Anything up above that is overwhelming.

11              I walked into leading, supervising,

12   forming, managing 22 people.  That's not including

13   the contractors that come in on the daily basis.

14              So at any given point, I could have

15   30 to 40 people on that site that I'm trying to

16   lead, manage, supervise, and look over, including

17   the budget.  Maintenance budget.  That's what I mean

18   by that.

19        Q.    Okay.  And was that something that

20   was -- was that a bigger group and a larger set of

21   responsibilities than you had had in the past?

22              MR. JOHNSON:  Object to form.

23        A.    Yes.

24        Q.    (BY MR. GRIFFITTS)  Okay.

25        A.    Yes.  That's what I meant when I said it

APP. 0000008

BROWN, JONATHAN  *  September 18, 2018

Page 23

1    was "too much."  I don't --

2        Q.    Right.

3        A.    -- I started to walk away.

4        Q.    Okay.  Were you actually, like, looking

5    for jobs, like, interviewing and sending out

6    résumés, that kind of stuff?

7        A.    No immediately, no.

8        Q.    Okay.

9        A.    I have a rule to myself.  I don't want

10   to leave any job.  I want to get at least two to

11   three years of experience.

12       Q.    Okay.

13       A.    Before I walk away from a job.  It looks

14   bad on my résumé.

15       Q.    Okay.

16       A.    And, like I said, I'm not opposed to a

17   challenge, so...

18       Q.    All right.  Thank you.

19             I'm going to show you what we'll

20   mark as Exhibit No. 2.

21             (Exhibit 2 marked/introduced.)

22       Q.    (BY MR. GRIFFITTS)  Ask you if you

23   recognize this as your performance review?  And by

24   the way, just so that you understand the process

25   here, sir.

BROWN, JONATHAN  *  September 18, 2018

Page 36

1      Q.     (BY MR. GRIFFITTS)  Okay.  But it was
2  his responsibility to make sure that if he did work
3  on something, right, that it got put into the
4  electronic system; correct?
5                    MR. JOHNSON:  Object to form.
6      A.     I wouldn't say it was solely his
7  responsibility.  As I mentioned earlier, it wasn't a
8  process that was going on at that plant, at that
9  time.
10                   And not just Geismar plant.  Keep in
11  mind, all plants were that way.  But it wasn't
12  something that was -- it was a culture that needed
13  to be changed that we actually changed.
14     Q.     (BY MR. GRIFFITTS)  Okay.  So I need to
15  make sure we're clear.
16                   First off, when you talk about
17  "other plants," you didn't ever work -- other than
18  the Geismar and St. Charles -- well, just let me
19  finish.
20     A.     Yeah, yeah.
21     Q.     You didn't work at the other plants,
22  other than Geismar and St. Charles, at any time
23  during your work for Praxair, did you?
24     A.     That's correct.
25                   MR. JOHNSON:  Object to form.

APP. 0000010

BROWN, JONATHAN   *   September 18, 2018

Page 70

```
 1        Q.      (BY MR. GRIFFITTS)  Sir --
 2                MR. JOHNSON:  Object to form.
 3        Q.      (BY MR. GRIFFITTS)  -- did you think --
 4   at the time that the cold eyes review was set up by
 5   Mr. Willis, did you think that that was being done
 6   because of your race?
 7                MR. JOHNSON:  Object to form.
 8        A.      Initially, during that time, no.
 9        Q.      (BY MR. GRIFFITTS)  Okay.
10        A.      No.
11                Later on, as -- as we progressed,
12   later on, looking back, I think this was a step to
13   it.  I think this was probably where it began.
14        Q.      Okay.  So when the cold eyes review
15   happened, you didn't think Jim was -- Jim Willis was
16   discriminating against you on the basis of your
17   race.  But later on down the road, you looked back
18   on it and thought, "Well, maybe that was because of
19   my race"?
20        A.      That's the thought that come to my mind.
21        Q.      Okay.  So Jim Willis -- did Jim Willis
22   ever use any racial remarks towards you or racial
23   slurs or say or do anything that you felt was
24   harassing or discriminatory on the basis of your
25   race?
```

BROWN, JONATHAN  *  September 18, 2018

Page 71

1                    MR. JOHNSON:  Object to form.

2        A.      I would say yes.

3        Q.      (BY MR. GRIFFITTS)  What was that?  What

4   racial slurs or comments or actions did he take that

5   was harassing on the basis of your race?

6        A.      Comments.  During our meetings, when we

7   used to meet, when we was talking about setting up

8   the St. Charles site -- and they also had a site in

9   Port Arthur, which was a sister/brother-type site,

10  the same type site -- we were meeting to determine

11  spare parts.  And I was very offended by some of the

12  conversation we had, just in general, about the

13  President of the United States, which was Barack

14  Obama at the time.

15                   And we used to get into

16  conversations about -- they had the shooting at the

17  school.  And the conversation is about, "Hey, he's

18  going to end up taking our guns," talking about how

19  they were loading up on weapons and bullets.  And,

20  basically, bashing the President of the United

21  States.

22                   And I was very offended by that,

23  because when you have meetings like that, from a

24  professional standpoint, you're not there to talk

25  about politics.  And it was constantly.

BROWN, JONATHAN  *  September 18, 2018

Page 72

1    Every -- several times they brought that up and to a

2    point to where I had to make the statement, "Why are

3    we going there?  Why are we here talking about

4    that?"

5                    And, yes, Jim Willis was part of

6    that.

7         Q.    Okay.  Let me ask.

8                    So what exactly did Jim -- first

9    off, when did this take place?

10        A.    I can't tell you a date of it.

11        Q.    Well...

12        A.    But I can -- I can tell you some

13   witnesses to it, though, that was also offended by

14   it.

15                    MR. GRIFFITTS:  Objection.

16              Nonresponsive.

17                    MR. JOHNSON:  Let him finish his

18              answer.

19        Q.    (BY MR. GRIFFITTS)  Sir --

20                    THE WITNESS:  Okay.

21        Q.    (BY MR. GRIFFITTS)  Sir --

22                    MR. GRIFFITTS:  I'm letting him

23              finish his answer.

24                    MR. JOHNSON:  Mr. Brown, finish

25              your -- if he's cutting you off, just say,

APP. 0000013

BROWN, JONATHAN  *  September 18, 2018

Page 76

1     A.     I don't do that.  That's just not in my

2  nature.

3     Q.     Okay.

4     A.     I'm a retired military person.  I

5  believe in supporting your president, whether you

6  agree with him or not; so, no, I didn't bash him.

7     Q.     So -- but it's true to say that not one

8  of these comments that was made about the President

9  taking our guns, not one of those comments was

10  directed at your race, President Obama's race, or

11  any other person's race, was it?

12               MR. JOHNSON:  Object to form.

13     A.     I mean, no one mentioned my race,

14  President Obama's race, but I thought it was

15  inappropriate to keep bringing it up.

16     Q.     (BY MR. GRIFFITTS)  Okay.  So it could

17  have been the fact that they didn't like the fact

18  that he was a democrat, or they didn't like the fact

19  that he thought he was pro gun control; true?

20               MR. JOHNSON:  Object to form.

21     A.     That -- that's not how I review -- see

22  it, to be honest with you, because it was constant.

23     Q.     (BY MR. GRIFFITTS)  Okay.

24     A.     And it shouldn't have been.

25     Q.     I appreciate that.

APP. 0000014

BROWN, JONATHAN  *  September 18, 2018

Page 77

1           But whether it was constant or one
2    time, there wasn't one mention of Mr. -- of your
3    race or Barack Obama's race when they were talking
4    about gun control post-Sandy Hook; right?
5                MR. JOHNSON:  Object to form.
6        A.    They're not going to say "race."  No, it
7    wasn't.
8        Q.    (BY MR. GRIFFITTS)  Okay.
9        A.    They're not going to say that.
10       Q.    That's just your subjective belief
11   that -- that -- because the President happened to be
12   black, that that was somehow racially motivated; is
13   that true?
14                MR. JOHNSON:  Object to form.
15       A.    That's what I believe, yes.
16       Q.    (BY MR. GRIFFITTS)  Okay.  And, of
17   course, Sandy Hook, for the record, happened in
18   December of 2012.  Does that sound correct?
19       A.    I don't remember.
20       Q.    Okay.  And, of course, you never made a
21   complaint to human resources, to the company hotline
22   for making complaints about any comments related to
23   the discussion of President Obama and gun control,
24   did you?
25                MR. JOHNSON:  Object to form.

BROWN, JONATHAN  *  September 18, 2018

Page 78

1      A.      Isolated incident.  That's the first

2  time I noticed anything like that.

3      Q.      (BY MR. GRIFFITTS)  Okay.

4      A.      No, I didn't.

5      Q.      You did not?

6      A.      I didn't see the need to, at that time,

7  yes.

8      Q.      Right.

9              Now, you mentioned that raises were

10  given to you before; correct?

11      A.      Yes.

12      Q.      And, in fact, Jim Willis gave you raises

13  twice in 2013, didn't he?

14      A.      Yes.

15      Q.      And he gave you another raise in 2014,

16  didn't he?

17      A.      Yes.

18      Q.      And in your dealings with him, through

19  2012 through 2013 through 2014, y'all had a cordial,

20  professional, affable relationship, didn't you?

21              MR. JOHNSON:  Object to form.

22      A.      2012, 2013, probably part of 2014, yes.

23      Q.      (BY MR. GRIFFITTS)  All right.  I mean,

24  he would come down --

25      A.      We had a good -- go ahead.  Go ahead.

APP. 0000016

BROWN, JONATHAN  *  September 18, 2018

```
                                                Page 79
 1      Q.    No.  Go ahead.  I --
 2                 MR. JOHNSON:  Finish your answer.
 3      Q.    (BY MR. GRIFFITTS)  I didn't mean to
 4   interrupt.
 5      A.    We had a good relationship until Jim
 6   Willis was no longer my supervisor.
 7      Q.    Got it.  So we'll talk about that in a
 8   second.
 9                 But, like, when he would come down
10   in 2012, 2013, 2014, y'all would, from time to time,
11   go to lunch when he was in the area --
12      A.    Yes.
13      Q.    -- right?
14      A.    Yes.
15      Q.    Y'all would talk about your family;
16   right?
17                 MR. JOHNSON:  Object to form.
18      A.    Yes.
19      Q.    (BY MR. GRIFFITTS)  He showed interest
20   in your family?
21                 MR. JOHNSON:  Object to form.
22      A.    Yes.
23      Q.    (BY MR. GRIFFITTS)  You showed interest
24   in his family and his children; correct?
25      A.    Yes.
```

BROWN, JONATHAN  *  September 18, 2018

Page 80

1    Q.    You knew he had young children?

2    A.    Uh-huh.

3    Q.    Is that a "yes"?

4    A.    Yes.

5    Q.    And y'all would engage in the way that

6    professionals with mutual respect for each other

7    would engage; true?

8    A.    Yes.

9              MR. JOHNSON:  Object to form.

10   Q.    (BY MR. GRIFFITTS)  Now, in 2015, there

11   were some changes that occurred; is that true?

12   A.    Yes.

13   Q.    All right.  So 2015 Todd Dunn got

14   promoted to vice president of operations; is that

15   right?

16   A.    That's correct.

17   Q.    Okay.  Did you have any problem with

18   Todd Dunn getting promoted to vice president of

19   operations?

20   A.    I didn't have any problem with that.

21   Q.    All right.  Todd Dunn's a good guy;

22   right?

23             MR. JOHNSON:  Object to form.

24   A.    Didn't have too many interaction with

25   Todd Dunn.

APP. 0000018

BROWN, JONATHAN  *  September 18, 2018

Page 81

1      Q.      (BY MR. GRIFFITTS)  Okay.

2      A.      I know initially I did when he -- they

3  came down to review my work performance.  I had to

4  do a presentation for them, in which they all were

5  pleased.

6      Q.      Okay.  And is Todd another guy that you

7  would, from time to time, if he was around, go to

8  lunch with, or was he just not --

9      A.      No.

10     Q.      Okay.  Certainly, you didn't think that

11  Mr. Dunn was -- had discriminated against you on the

12  basis of your race when you got promoted -- or when

13  he got promoted to vice president of operations; is

14  that right?

15              MR. JOHNSON:  Object to form.

16     A.      When he got promoted?

17     Q.      (BY MR. GRIFFITTS)  Yeah.

18     A.      Prior to him getting promoted, no.

19     Q.      Okay.  Now, when Mr. Dunn got promoted,

20  Mr. Willis was, in turn, promoted to his position;

21  is that right?

22     A.      Yes.  Yes.

23     Q.      All right.  Did you agree that

24  Mr. Willis was a qualified candidate for that

25  position?

BROWN, JONATHAN  *  September 18, 2018

Page 86

1          break.

2                    THE VIDEOGRAPHER:  Off the record,

3          11:07 a.m.

4                    (Break.)

5                    THE VIDEOGRAPHER:  Back on record,

6          11:18 a.m.

7          Q.    (BY MR. GRIFFITTS)  By the way, I want

8     to go ahead and tell you, if you need to take a

9     break for any reason, you just let me know.  Okay?

10         A.    Okay.

11         Q.    All right.  We were talking -- when we

12    got done talking, right before the break, you

13    mentioned the discussion that you had with Courtni

14    Booker where you told her that you believed you'd

15    been the subject of false accusations regarding your

16    performance and that you talked to her in Louisiana.

17                    And after you showed her what you

18    thought the false allegations were, she agreed

19    that -- and she said something to the effect of, I

20    quote, "Something doesn't seem right"; is that

21    correct?

22         A.    Yes.

23         Q.    Okay.  And so we'll get into

24    the -- we'll get into the substance of what those

25    allegations are in a second.  Okay?  I assure you.

APP. 0000020

BROWN, JONATHAN  *  September 18, 2018

Page 88

1            I explained to him that "Gary should
2    have come to me to understand what he was looking at
3    before he reported it to you."
4            It goes back to what I was saying
5    earlier, when they come to the site, they go back
6    and report stuff that's totally inaccurate.  And
7    then they -- I -- I find myself having to prove what
8    they said is wrong.
9        Q.    Okay.  I'm sorry, I'm just -- I want to
10   make sure I understand, because there was a lot of
11   "theys" and "thems" and "hims," and I kind of got a
12   little lost --
13       A.    Okay.
14       Q.    -- on who was saying what.
15       A.    Okay.
16       Q.    So -- so -- so, first off, you felt
17   like -- I think I got this right --
18       A.    Okay.
19       Q.    -- you felt like Brian Burt was accusing
20   you of falsifying documents?
21       A.    Yes.
22       Q.    And I think, if I understand that
23   correctly, you thought that he got that impression
24   from Gary Oehlert?
25       A.    He did.

BROWN, JONATHAN  *  September 18, 2018

Page 89

1        Q.        Okay.  So that's what you told Courtni

2   Booker about; true?

3        A.        Yes.  Yes.

4        Q.        All right.  So other than falsifying

5   documents, what else did you tell Courtni Booker

6   about when you say that "false accusations were made

7   concerning my performance"?

8        A.        I was trying to recall.  There was a few

9   other things I mentioned to her.  I mentioned to her

10  about the past with Scott Sexton.  When he came to

11  the site on the weekend, he accused me of having

12  contractors on-site that -- that wasn't supposed to

13  be there, and paying for work that wasn't performed.

14       Q.        Okay.

15       A.        And not keeping up with the time sheets.

16                 I told her about that one.  And,

17  again, this happened prior to that one -- the

18  incident with Brian Burt and Gary Oehlert.  It

19  happened prior the that.

20       Q.        Right.

21       A.        So I ended up showing them that I kept a

22  record of all documents dating back for two years.

23  I kept records of all time sheets.  I kept record of

24  all requisition and purchase orders.  I kept them

25  all in the files.  I accounted for every hour, every

BROWN, JONATHAN  *  September 18, 2018

Page 90

1  penny, every dime.  And I had them all in a file.

2                    And when they reviewed it, they said

3  I was doing a good job.

4        Q.      Who said that?

5        A.      James Willis.

6        Q.      Okay.  When did he say that?

7        A.      I don't know when he said it, but

8  there's emails of it.

9        Q.      Do you even remember a year when it was

10 said?

11       A.      No.  I could probably retrieve that.

12 But I have the documents for it as well.

13       Q.      Okay.

14       A.      I can retrieve it.

15       Q.      Okay.

16       A.      But I don't remember the year.

17       Q.      Okay.  So you told Ms. Booker -- first

18 off, do you remember the month that you met with

19 Ms. Booker?

20       A.      I think it was in February.

21       Q.      In February, okay.

22                    MR. JOHNSON:  Of what year?

23                    THE WITNESS:  Of 2000...

24       Q.      (BY MR. GRIFFITTS)  '16.

25       A.      '16, yes.

BROWN, JONATHAN  *  September 18, 2018

Page 91

1      Q.     So you meet -- so she comes down to the
2   plant.  You talk with her in February of '16.  You
3   tell her about this past issue with --
4      A.     Present issue.
5      Q.     Well, I'm going to list them out.
6             So you've got Scott Sexton saying
7   that you didn't have all the paperwork on the
8   contractors correct, the issue with Brian Burt and
9   Gary Oehlert supposedly accusing you of falsifying
10  documents.
11            Did you tell her about any other
12  stuff that you felt was accusations that were made
13  concerning your performance?
14     A.     I'm trying to recall.  I know I did, but
15  I just can't think of what it was right now.
16     Q.     Okay.  And her comment to you was that
17  that didn't seem right; is that correct?
18     A.     Right.  Yes.  Yes.
19     Q.     And she told you that she would go
20  report that to her boss, which was Vanjia Thomas;
21  correct?
22     A.     Yes.  Yes.
23     Q.     All right.  And so -- but whereas
24  you -- you stated to Ms. Booker that you would
25  recognize -- or that you believed you were being the

BROWN, JONATHAN  *  September 18, 2018

Page 103

1   regarding what you believed was race discrimination

2   towards you and being placed on the performance

3   improvement program.

4           A.      I never gave them any information,

5   because he never come to me and talked to me about

6   it, like I said.  I don't think he got all the

7   information that I wanted to present to him.

8                       And my belief is that corporate

9   security is Praxair.  My belief is that HR is

10  Praxair.  My belief was that, really, I wasn't going

11  to get the right representation I needed until I go

12  to EEOC.  And that's what I ended up doing.

13          Q.      You're not suggesting that -- first off,

14  do you know who Greg Alexander is?

15          A.      I don't know him personally, no.

16          Q.      Right.

17                      He's in corporate security; right?

18          A.      Yes.

19          Q.      And he was the one who investigated your

20  complaint; right?

21          A.      Yes.

22          Q.      And, in fact, he interviewed you for

23  several hours, didn't he?

24          A.      Several hours -- what's "several hours"?

25  How many hours is that?

APP. 0000025

BROWN, JONATHAN   *   September 18, 2018

Page 144

```
 1              Rule 37 regarding that as it concerns
 2              attorney-client privileged matters.
 3                   MR. GRIFFITTS:  Why has it not been
 4              produced?
 5                   MR. JOHNSON:  I've asserted my
 6              statement.  Please proceed with the
 7              deposition.  We can schedule a Rule 37
 8              conference regarding that as it gets into
 9              attorney-client privilege.
10         Q.   (BY MR. GRIFFITTS)  Sir, this recording,
11    how was it taken?  How did you conduct this
12    recording?
13         A.   After I had my first interview about my
14    performance, it was written by Brian Burt.
15         Q.   Is this the one on April 13th?
16         A.   Yes.
17         Q.   Okay.
18         A.   Proceeding forward, I decided I need to
19    make sure I have recordings of everything that was
20    said.
21         Q.   Okay.  So how many recordings did you
22    take?
23         A.   I don't recall.
24         Q.   More than one?
25         A.   Yes.
```

APP. 0000026

BROWN, JONATHAN  *  September 18, 2018

Page 145

1      Q.      More than two?

2      A.      Yes.

3      Q.      More than three?

4      A.      I recorded all of my performance

5   interviews with Mr. James Willis.  Craig Robnik, I

6   recorded those as well.

7      Q.      Okay.  Did you -- how did you -- what

8   was your method of recording those?

9      A.      I had them in my -- I had my recorder in

10  my backpack.

11     Q.      Was it an iPhone -- like, a phone or

12  actually a recorder?

13     A.      A recorder.

14     Q.      Okay.  And so with respect -- so you

15  would turn on the recorder, have the meetings.  I

16  take it you did not tell the people present that

17  they were being recorded, did you?

18     A.      Not directly.

19     Q.      Did you think that that was an honest

20  thing to do?

21             MR. JOHNSON:  Object to form.

22     A.      I didn't see it being dishonest.

23     Q.      (BY MR. GRIFFITTS)  You knew it was

24  sneaky, didn't you?

25             MR. JOHNSON:  Object to form.

BROWN, JONATHAN  *  September 18, 2018

Page 154

1    that area." [As read]

2                    Did I read that portion correctly?

3    A.        Yep.   That's what you read, yes.

4    Q.        Yeah.

5                    And it -- and that's true, that

6    until he asked you about claims of discrimination,

7    or possible discrimination, you hadn't brought up

8    discrimination during this interview, isn't that

9    true?

10                   MR. JOHNSON:  Object to form.

11   A.        When I sent the email to him initially,

12   I wanted to him to investigate it and see that it

13   was discrimination.

14   Q.        (BY MR. GRIFFITTS)  Okay.  But when he's

15   interviewing -- when he was interviewing you on the

16   phone, you didn't raise discrimination until after

17   he asked you about it; right?

18                   MR. JOHNSON:  Object to form.

19   A.        I mean...

20   Q.        (BY MR. GRIFFITTS)  That's true, isn't

21   it?

22                   MR. JOHNSON:  Object to form.

23   A.        Yes.  Yes.  I believe that.  I'm not

24   sure.  That's -- I don't remember that conversation.

25   Q.        (BY MR. GRIFFITTS)  Okay.  Well, you

APP. 0000028

BROWN, JONATHAN  *  September 18, 2018

Page 155

1  don't dispute that that's true; right?

2              MR. JOHNSON:  Let him finish.

3       A.    I'm not disputing it, but I don't recall

4  how the whole conversation went.

5       Q.    (BY MR. GRIFFITTS)  Okay.  Thank you.

6              Now, "Brown" -- he goes on to say,

7  "Brown said that he did not have any specific reason

8  to think the PIE/PIN was racially motivated, but

9  that it could be since he did not see any problems

10 with his performance and so racial motivation might

11 be a factor."

12             Did I read that portion correctly?

13      A.    Yes.  Yes.

14      Q.    And, in fact, that's what you told Greg

15 Alexander, isn't it?

16             MR. JOHNSON:  Object to form.

17      A.    Yes.

18      Q.    (BY MR. GRIFFITTS)  All right.  And so,

19 it goes down to -- you talk about the

20 African-American chemical engineer.  That's Rachel

21 Iheanacho, isn't it?

22      A.    Yes.  Yes.

23      Q.    All right.  So you told him about

24 Rachel, but you didn't tell him about all these

25 other people that you now claim, such as Chanel,

BROWN, JONATHAN  *  November 21, 2018

Page 196

1    right?

2          A.    No.

3          Q.    And, in fact, you agree that that was a

4    pretty fair evaluation of the things that you were

5    doing well and the things that -- that needed to be

6    improved at the plants, generally?

7          A.    Yes.  For the most part, yes.

8          Q.    All right.  Now, I want to talk about --

9    I'll show you what we'll mark as Exhibit 8.

10                    (Exhibit 8 marked/introduced.)

11         Q.    (BY MR. GRIFFITTS)  I'll represent to

12   you that that's a calendar invitation sent by

13   Mr. Willis on -- for a September 24, 2015, meeting

14   regarding financial work process discussion; is that

15   what that appears to be?

16         A.    Yes.

17         Q.    Okay.  And you were one of the

18   recipients of that calendar invitation; is that

19   correct?

20         A.    Yes, I am.

21         Q.    Yeah.  And, in fact, during the summer

22   of 2015, Mr. Willis started -- Mr. Willis and others

23   at the company in finance roles started working on

24   providing information to people such as yourself,

25   you and others, regarding the end-of-year financial

APP. 0000030

BROWN, JONATHAN  *  November 21, 2018

Page 197

1    and accrual process; is that right?

2          A.     Yes.  That's correct.

3          Q.     Okay.  And that started in the summer

4    because there needed to be plenty of time for people

5    like you to plan and prepare for the accrual process

6    to get all of the -- all of your numbers in in time

7    and on target; right?

8          A.     Correct.  That's correct.

9          Q.     I'll show you what we'll mark as Exhibit

10   No. 9.

11                (Exhibit 9 marked/introduced.)

12         Q.     (BY MR. GRIFFITTS)  Ask you to take a

13   look at that.

14                And, sir, do you recognize Exhibit

15   No. 9 as a calendar entry with detailed email on it

16   sent -- it looks by Brian Burt to a variety of

17   people, yourself included.

18         A.     Yes, I recognize that's what it is.

19   Yes.

20         Q.     And the subject is, "Expense 830

21   Invoicing Close -- Mandatory"; is that right?

22         A.     Uh-huh.

23         Q.     All right.  What's -- what is, "Expense

24   830 Invoicing Close" mean?

25         A.     That mean all the invoices should be

BROWN, JONATHAN  *  November 21, 2018

Page 199

1  meeting is to kick off this effort and get

2  suggestions from this team on any method to

3  streamline/expedite this process.  Every penny that

4  hits the books" -- or "hits the 2015 books is one we

5  don't have to talk about next year."

6                    Is that right?

7       A.     Uh-huh.

8       Q.     Is that a "yes"?

9       A.     That's correct.

10      Q.     Okay.  So the notion is you wanted to

11  get as much of your invoices that were invoiced to

12  the company in 2015 paid or accrued in 2015 so that

13  you weren't paying for them in 2016?

14      A.     That's exactly right.  Yes.

15      Q.     All right.  So now if you look down,

16  does this last two paragraphs seem to be the

17  cut-and-paste of Jim's email into Brian's stuff --

18      A.     Yes.

19      Q.     -- in earlier -- is that what that

20  appears to be?

21      A.     Yes.

22      Q.     Yeah.

23                    And in -- in Jim's email, he, again,

24  says that, "The goal of the exercise is to minimize

25  accruals at the end of the year and eliminate 2015

BROWN, JONATHAN  *  November 21, 2018

Page 201

1      A.      That's right.

2      Q.      And if you look down, kind of midway,

3  from the forwarded messages where he's got a

4  numbered list, and he -- he writes, "As announced in

5  November on Airwaves, the deadline to submit

6  invoices to Accounts Payable for year end processing

7  is this Friday December 11th.  Anything missing this

8  deadline; please follow the guidelines below:"

9              And he says, number 1, "All costs

10  for goods or services received, whether expense or

11  capital, in 2015 need to be sent in for accruals to

12  Tetyana and BJ; the deadline is noon January 4th,

13  2016." [As read]

14              Did I read that portion correctly?

15      A.      Yes, you did.

16      Q.      Okay.  And that was a deadline that

17  y'all have known for a while; right?

18      A.      That's correct.

19      Q.      All right.  And when it came down to it,

20  you didn't make that deadline, did you?

21      A.      Yes, I did make my deadline.

22      Q.      Okay.  Tell me how you made your

23  deadline.

24      A.      Well, let me explain how I made my

25  deadline.  I'm glad we go to this topic.

APP. 0000033

BROWN, JONATHAN  *  November 21, 2018

Page 202

1       Q.     Okay.

2       A.     I was in charge of the maintenance

3   budget.  Maintenance.  All right?  Robert Sibley --

4       Q.     830s?

5       A.     830, yes, for maintenance.

6              Robert Sibley was hired as our

7   turnaround coordinator.

8       Q.     Okay.

9       A.     He was in charge of the turnaround

10  budget.

11             When he first arrived, at one point,

12  he was under me.  Brian Burt changed that.  Robert

13  Sibley reported to him to handle the turnaround

14  budget.  I reported to him to handle the maintenance

15  budget for the plant itself.

16      Q.     Say that one more time, that last part.

17      A.     The maintenance budget, just the

18  maintenance side.  He told me to focus on running

19  the plant's maintenance.  Robert Sibley would focus

20  on turnaround.

21             So all 830 expenses that fell under

22  maintenance, other than turnarounds, was my

23  responsibility, in which I got accruals in.  And I

24  had no problem with accruals.

25             Robert Sibley, under Brian Burt, did

BROWN, JONATHAN  *  November 21, 2018

Page 203

1   not get the turnaround accruals in.

2       Q.     Okay.

3       A.     So let me finish.

4              Came February, and, I guess, after

5   all of this was coming up about it not getting put

6   in, all of a sudden, Robert Sibley was put back

7   underneath me, which I didn't understand until April

8   when they called me in for this performance

9   improvement plan.  I was very puzzled by that.

10             But Robert Sibley reported to Brian

11  Burt, and I reported to Brian Burt.  And Robert

12  Sibley was responsible for the turnaround budget.

13  Not me.

14      Q.     Okay.

15      A.     Prior to that, we never had an issue.

16  When I had turnaround budget, accruals always got

17  done on time, like they were supposed to.

18             So I'm going to be honest with you,

19  no, I was not looking at turnaround budget because

20  it was not my responsibility.

21             MR. GRIFFITTS:  I'm going to object

22         to the nonresponsive portion.

23             MR. JOHNSON:  Object to form.

24      Q.     (BY MR. GRIFFITTS)  Mr. Brown, you talk

25  about turnaround budget.  Turnaround goes under what

APP. 0000035

BROWN, JONATHAN  *  November 21, 2018

Page 206

1      Q.      (BY MR. GRIFFITTS)  My question to you

2    is simply a simple question.  You never sent Jim

3    Willis an email or had a discussion with Mr. Willis

4    saying, "Hey, I'm not responsible for turnaround;

5    right?"

6                    You never did that, did you?

7      A.      No, I didn't have to, sir.

8      Q.      Okay.  Now, it's not your testimony

9    under oath to the ladies and gentlemen of the jury

10   that the over $500,000 in missed accruals was solely

11   due to turnaround; right?

12     A.      That's what most of it was from, sir.

13                    MR. GRIFFITTS:  All right.

14              Objection.  Nonresponsive.

15     Q.      (BY MR. GRIFFITTS)  That's not my

16   question, sir.

17                    MR. JOHNSON:  Object to form.

18     Q.      (BY MR. GRIFFITTS)  Please listen to the

19   question.

20                    You're not claiming that the only

21   accrual misses between you and Mr. Sibley -- you're

22   not claiming that the only misses were by Mr. Sibley

23   and you had no misses, did you?

24     A.      I don't recall, sir.  But the majority

25   of the money that was accrued -- that wasn't accrued

BROWN, JONATHAN  *  November 21, 2018

Page 207

1   was from the turnaround budget.

2        Q.    Okay.  So if you say "the majority,"

3   then there were some accrual amounts that were your

4   responsibility that didn't go to turnarounds; isn't

5   that correct?

6              MR. JOHNSON:  Objection.  Form.

7        A.    Not that I recall.  Not that I recall,

8   sir.

9        Q.    (BY MR. GRIFFITTS)  You don't recall

10  that?

11       A.    I don't recall -- the big hitters, the

12  issues, that brought all of this up were from the

13  turnaround budget.

14       Q.    Okay.

15       A.    Now, there might be a small amount of

16  dollars from the maintenance debt.  I don't recall.

17  But for the most part, the reason why we had a lot

18  of this discussion was from the turnaround budget.

19       Q.    Okay.  Do you have any -- any emails or

20  documents that -- or notes that verify your

21  contention that you were not responsible for the

22  turnaround portion of accruals on maintenance for

23  the 2015 accrual process?

24       A.    I might.  I'd have to review my

25  documents.  I have a stack of them.  I might.  But I

APP. 0000037

BROWN, JONATHAN  *  November 21, 2018

Page 208

1   do have -- I'm pretty sure I can pull up where Brian

2   Burt said that Robert Sibley is the one to focus on

3   turnaround and I focus on maintenance --

4        Q.    How big is --

5        A.    -- focus on maintenance.

6        Q.    How big is the stack of documents that

7   you've got?

8        A.    It's huge.

9        Q.    It's bigger than that?

10       A.    I had 10 weeks -- 10 to 11 weeks.  I

11  don't know how long they -- they put me into

12  deciding on if I wanted to take that severance

13  package.  They -- I sat home for 10 weeks reflecting

14  on that, and I put together quite a bit of

15  information.

16       Q.    Okay.  Is that -- is that stack of

17  documents bigger than --

18       A.    It is --

19       Q.    Please, sir.  Please.

20       A.    I was going to ask you a question.  Go

21  ahead.  Go ahead.

22       Q.    Out of respect for the court reporter,

23  please let me finish.

24       A.    Okay.

25       Q.    Is it taller than a centimeter tall?

APP. 0000038

BROWN, JONATHAN  *  November 21, 2018

Page 210

```
 1       Q.      Sure.  While you read that, I'm going to
 2   step out.  I'll be right back.  Just going to grab
 3   something in the other room.
 4                    (Mr. Griffitts exits and reenters
 5   the room.)
 6       A.      Okay.  Yeah, I do remember something
 7   about a motor we did replace.
 8       Q.      (BY MR. GRIFFITTS)  Okay.  Have you ever
 9   seen this document before is all I'm asking you,
10   sir?
11       A.      I don't remember it.
12       Q.      Okay.
13       A.      I just remember some -- the issue with
14   the motor.  That, I do remember.
15       Q.      Okay.  So Tetyana Antonyuk -- is that
16   how you say her last name?
17       A.      I don't --
18       Q.      Okay.
19       A.      I think so.
20       Q.      Okay.
21       A.      I think so, yes.
22       Q.      But she was the financial analyst for
23   Global HyCO; right?
24       A.      Yes.
25       Q.      So she writes to Jim Willis and Todd
```

BROWN, JONATHAN  *  November 21, 2018

Page 211

1   Dunn --

2        A.      Uh-huh.

3        Q.      -- who are your supervisor's supervisor,

4   and then his supervisor; right?

5        A.      Yes.

6        Q.      Okay.  So they're respectively two and

7   three rungs above you; right?

8        A.      Yes.

9        Q.      Okay.  She writes them, "Attached file

10  shows the compiled list of all expense accruals sent

11  in to date.  Pending verification, the total is

12  580,000, which is significantly lower than your

13  expected gap for 2015.  Accrual submissions were due

14  at noon.  Please make sure everyone sends in their

15  accruals in the next hour or so." [As read]

16              Jim Willis writes back, "My total

17  gap expense Work Orders was approximately 1.15

18  million.  Jonathan Brown is working on his now but

19  has been fighting a bad motor at the site and got

20  distracted.  Geismar accounts for 600,000 of my

21  gap...there lies the problem." [As read]

22              Did I read that correctly?

23       A.      Yes, you did.

24       Q.      Okay.  And that was a true statement,

25  was it not?

APP. 0000040

BROWN, JONATHAN  *  November 21, 2018

Page 212

1           MR. JOHNSON:  Object to form.

2      A.     I do recall I was dealing with a motor

3 that we were -- a motor issue; but, yes, I don't

4 know about the -- yes, I was dealing with a motor

5 issue.  Yes, sir.

6      Q.     (BY MR. GRIFFITTS)  Okay.  And so do you

7 recall talking with Jim on the 4th and the 5th about

8 him trying to get you to get the accruals in?

9      A.     Yes.

10      Q.     Okay.  And he was trying to get all the

11 accruals in, not just -- not just the maintenance

12 accruals minus the TAR work; right?

13      A.     Yes, he was trying to get them all in.

14 Yes, sir.  That's a true statement.

15      Q.     Okay.  And he was working with you to

16 get it in; right?

17      A.     Yes.  Working with us to get it in, yes.

18      Q.     Who's "us"?

19      A.     Myself and Robert Sibley.

20      Q.     Okay.

21      A.     Yes.

22      Q.     Okay.  But he was dealing with you with

23 regard to the accruals for both yourself and Robert

24 Sibley; right?

25      A.     He was dealing with me and dealing with

APP. 0000041

BROWN, JONATHAN  *  November 21, 2018

Page 213

1   Robert Sibley.

2        Q.     Are you telling me he was separately

3   calling Mr. Sibley?

4        A.     Sibley was heavily involved in getting

5   the accruals in for the turnaround.  I don't know

6   why he -- his name keep getting left out of this,

7   sir.

8              I'm telling you that Brian Burt was

9   the main person I was talking to, not Jim Willis.

10             Brian Burt was working with me to

11  get my accruals in, and he was working with Robert

12  Sibley to get his accruals in.

13             Robert Sibley was working with two

14  financial personnel; one of them left, and the other

15  one stayed back behind.

16             And now every once in a while, he

17  would come to me for help, which I was able to help

18  him; so I gave him a lot of documentation.  I showed

19  him how to process work.  I showed him how to

20  download the spreadsheets.  I got with Sandy

21  Melanson, who was the financial lady working with

22  him.  I helped her out quite a bit.  And he was

23  working the turnaround budget and getting accruals

24  in.

25        Q.     Regardless, you don't dispute

APP. 0000042

BROWN, JONATHAN  *  November 21, 2018

Page 214

1    that -- regardless of what happened and who was told

2    what, there was a over $500,000 shortfall in

3    accruals in 2015 related to maintenance at Geismar;

4    right?

5        A.    That's right.

6              MR. JOHNSON:  Object to form.

7        A.    That's right.  There was.

8        Q.    (BY MR. GRIFFITTS)  You just -- it's

9    your contention that most of those were the

10   responsibility of Mr. Sibley?

11       A.    And Mr. Burt.

12       Q.    Okay.  Even though you're the

13   superintendent of the maintenance at the Geismar

14   plant?

15             MR. JOHNSON:  Object to form.

16       A.    Even though Brian Burt is -- yes, sir.

17   Even though Brian Burt was the manager who took the

18   turnaround accruals from me.  I'm going to state

19   that again.

20             I was told by Brian Burt I do not

21   have to worry about turnaround.  He hired a

22   turnaround coordinator to handle the turnaround

23   portion of Geismar site.  At one time it was mines,

24   but it was taken away from me.

25             MR. GRIFFITTS:  Object to the

APP. 0000043

BROWN, JONATHAN  *  November 21, 2018

Page 215

1              nonresponsive portion.

2                    MR. JOHNSON:  Object to form.

3         Q.    (BY MR. GRIFFITTS)  All right.

4    Mr. Brown, in 2015 there were some changes that

5    happened at the -- at the Geismar and the SELA

6    location; right?

7         A.    Yes.

8         Q.    Okay.  So we talked about Mr. Dunn got

9    promoted --

10        A.    Yes.

11        Q.    -- correct?

12        A.    Yes.

13        Q.    And Mr. Willis got promoted to

14   Mr. Dunn's prior position; right?

15        A.    Yes.

16        Q.    And Brian Burt, in essence, came to,

17   kind of, fill part of the role that Jim had done;

18   correct?

19        A.    Yes.

20        Q.    And at some point during 2015, Jorge

21   Lavastida moved on and was ultimately replaced by

22   Craig Robnik; is that right?

23        A.    Yes.

24        Q.    All right.  And Gary Oehlert was brought

25   in as an instrumentation analytical specialist due

BROWN, JONATHAN  *  November 21, 2018

Page 216

1    to some concerns that had been raised by OSHA; is

2    that right?

3         A.    That's correct.

4         Q.    Okay.  And there had actually been a

5    fatality; is that right?

6         A.    Yes.

7         Q.    Okay.  What was the -- when was the

8    fatality?

9         A.    I would say fall of 2012 or -- 2012 --

10    I'm not sure, sir.

11        Q.    Okay.

12        A.    I forget.

13        Q.    Okay.  Did you work at the company when

14    the fatality occurred?

15        A.    Yes.

16        Q.    Okay.  And what was the fatality

17    generally?  I mean, what happened?

18        A.    We had an operator who was loading

19    nitrogen onto a truck, and I think the hose broke,

20    became detached, and he got exposed with nitrogen.

21    And he die, asphyxiated.

22        Q.    Okay.  He was in a room, and it filled

23    up with nitrogen?

24        A.    It was outside.

25        Q.    Okay.

BROWN, JONATHAN  *  November 21, 2018

Page 217

```
 1        A.      It had a blast of nitrogen, and he just
 2   fell over.  And it continued to leak.  And the truck
 3   driver was still in the truck.  He didn't realize
 4   what was happening.  And by the time he realized it
 5   and saw him, it was too late.
 6        Q.      Got it.  Showing the nature of how
 7   dangerous it can be working with the kind of gases
 8   and chemicals that y'all would work with out at the
 9   SELA location; right?
10        A.      Yes.
11        Q.      And so Mr. Oehlert was brought in to,
12   kind of, help address some of those -- some of those
13   safety issues; correct?
14        A.      Yes.  At the time, it wasn't Oehlert.
15   It was another -- another gentleman.  I can't think
16   of his name right now, but he ended up leaving the
17   company.
18        Q.      Okay.  But then Oehlert came in?
19        A.      Oehlert came in, yes, at the latter
20   part.  Yes.
21        Q.      Right.  And he came -- and he was there
22   during 2015; is that right?
23        A.      Yes.  Yes.
24        Q.      And even -- partly into 2016; right?
25        A.      Yes.
```

APP. 0000046

BROWN, JONATHAN  *  November 21, 2018

Page 221

1    at -- at the Geismar facility?

2          A.     He -- he came on the site to help with

3    mostly the critical safety systems, which was the

4    shutdown, to -- for the safety of the plant.

5          Q.     Okay.

6          A.     That was -- that was the majority of the

7    work he did.

8          Q.     Okay.

9          A.     And also with analyzers as well, which

10   analyze all the gases at the plant, which is the

11   safety system as well.

12         Q.     Okay.  All right.  Now I want to talk

13   about this issue with respect to -- with respect to

14   analyzers.  Do you recall that issue coming up?

15         A.     Yes, I do.

16         Q.     Okay.  And so one of the things that

17   happened was Mr. Willis -- excuse me -- Mr. Oehlert

18   was in the plant and observed what he believed to be

19   an improper handling and calibration of the

20   analyzers; is that right?

21         A.     Yes.

22         Q.     Okay.  And so I'm going to show you what

23   we'll mark as Exhibit No. 12.

24                (Exhibit 12 marked/introduced.)

25         Q.     (BY MR. GRIFFITTS)  Ask you if you

APP. 0000047

BROWN, JONATHAN  *  November 21, 2018

Page 222

1    recognize Exhibit No. 12 as a string of emails, at

2    least starting at the bottom where Gary -- if you

3    start on the second page, Gary forwards to Brian an

4    email with pictures of the analyzers expressing his

5    concern.

6                    And then Brian Burt emails you about

7    how he found this situation to be unacceptable and

8    what he wanted you to do about it; right?

9         A.    Yes.

10        Q.    Okay.  So one of the things that Gary

11   writes -- excuse me.

12                    One of the things that -- you

13   complained about this email that you personally were

14   being accused of falsification of documents; is that

15   right?

16        A.    That's correct, yes.

17        Q.    Okay.  And is there any other document

18   other than this one, that you're aware, where you

19   were accused of being -- accused of falsifying

20   documents; or is this -- or is this the email that

21   you're referring to?

22        A.    This is the email I was talking about.

23        Q.    Okay.  So -- and are you specifically

24   referring to Mr. Burt's email at -- January 15,

25   2016, at 10:00 a.m.?

BROWN, JONATHAN  *  November 21, 2018

Page 223

1       A.      Yes.

2       Q.      All right.  So I'll just read it to you

3    real quick.  It says, "Jonathan, I've asked numerous

4    times for you make any changes necessary to insure

5    [sic] that analyzers rounds were being done and

6    completed.  You assured me that you had assigned

7    these rounds to the I & E Techs on a rotating basis

8    and that you had it under control.  I've had

9    multiple conversations with Gary, and my own

10   personal experience tells me it's not under control.

11   Pull everyone off what they are doing and get these

12   analyzer cylinders replaced and any necessary work

13   to restore analyzers to working condition.  I need

14   an update from you today on what you found and I

15   want each of Gary's photograph's identified and I

16   want a new photograph of the cylinder with the

17   proper pressure indication.  By Tuesday of next

18   week, I want to know which of the I & E Techs were

19   assigned this work.  I want you to collect and copy

20   all documentation showing this work had been done.

21   I want to know who supposedly did the work and who

22   signed off" on it -- "who signed off.  This is not

23   acceptable.  Refusal to perform and or document work

24   can not be tolerated.  Falsification of

25   documentation will not be tolerated.  Last item, no

APP. 0000049

BROWN, JONATHAN  *  November 21, 2018

Page 224

1   excuses.  I don't care what anyone is doing or has

2   planned for the next few days.  Get this done."

3                Did I read that portion correctly?

4        A.     Yes, you did.

5        Q.     So one of the issues was that they found

6   these analyzer cylinders with a zero reading; right?

7        A.     Yes.

8        Q.     Okay.  And so, first off, in -- you've

9   contended, as I understand it, that you were accused

10  of falsification of documents?

11       A.     That's correct.

12       Q.     Okay.  But here he doesn't say that

13  you've falsified any documents.  He simply says,

14  "Refusal to perform and or document work can not be

15  tolerated.  Falsification of documentation will not

16  be tolerated"; right?

17       A.     Yes.

18       Q.     All right.  And he's actually referring

19  to -- "I want to know which of the I & E Techs were

20  assigned to this work" [as read]; right?

21       A.     Yes.

22       Q.     Because he was concerned that the I&E

23  techs were saying that things had been properly

24  calibrated.  But we've got tanks reading zero, which

25  indicates that maybe they weren't; right?

APP. 0000050

BROWN, JONATHAN  *  November 21, 2018

```
                                                    Page 225
 1                   MR. JOHNSON:  Object to form.
 2        A.      That's what he was saying.
 3        Q.      (BY MR. GRIFFITTS)  Okay.
 4        A.      But that wasn't correct.
 5        Q.      Okay.  I understand you may have a
 6   technical dispute with whether or not that's
 7   correct, and we'll get into that in a second --
 8        A.      Okay.
 9        Q.      -- but my question is simply, his
10   concern was maybe you've got techs that are claiming
11   that they documented something that they didn't
12   really document; right?
13                   MR. JOHNSON:  Object to form.
14        A.      That was his concern, yes.
15        Q.      (BY MR. GRIFFITTS)  Right.
16        A.      Yes.
17        Q.      So he wasn't accusing you of falsifying
18   documents.  He was concerned that maybe people below
19   you were; right?
20        A.      I don't -- that's not how I operate.
21   That shouldn't be the way he operate.
22                   It goes back to what I was saying
23   previously when I was stating that you own up to
24   your subordinates.  Like Brian Burt should own up
25   the fact that Robert Sibley reported to him for
```

BROWN, JONATHAN  *  November 21, 2018

Page 226

1   turnaround.  I reported to him for plant

2   maintenance.  All right?

3               And anything Robert Sibley does and

4   I do is on Brian Burt, yes.

5               And if those technician were

6   falsifying documentation, yes, that's on me because

7   I reviewed those documentation.

8               So, yes, if you accuse my

9   technicians of falsifying documentation, that's on

10  me.  So, yes, I will say, yeah, he accusing me.

11      Q.     Well, it could be that he's bringing to

12  your attention that documentation may be falsified

13  and you need to know about it.  It's not saying you

14  did it.

15      A.     The documentation on instrumentation are

16  reviewed.  It's my responsibility to review those.

17      Q.     Okay.  But --

18      A.     So if they were falsified, yeah, I would

19  know about it.  I would definitely know about it.

20      Q.     So you're telling me -- you're telling

21  the ladies and gentlemen of the jury that you know

22  everything that your -- wait for it.

23               You're telling the ladies and

24  gentlemen of the jury that you know everything that

25  your I&E techs are doing out at the Geismar plant

BROWN, JONATHAN  *  November 21, 2018

Page 247

1   I'm asking what you have at home.

2        A.      No, not -- no, not at home.  No.  Not

3   all emails at home.  But I do archive emails.

4        Q.      How many emails do you have at home from

5   your time at Praxair?

6        A.      I've only had the ones I felt that I

7   needed to keep based on this situation.

8                    MR. GRIFFITTS:  Objection.

9            Nonresponsive.

10       Q.      (BY MR. GRIFFITTS)  How many, sir?

11       A.      I don't know a number, sir.  I can't

12   give you a number.

13       Q.      More than a hundred?

14                    MR. JOHNSON:  Object to form.

15       A.      More than a hundred, yes.

16       Q.      (BY MR. GRIFFITTS)  More than 250?

17       A.      That, I don't know.

18       Q.      I'm going to show you -- even

19   after -- you did admit there was a lot of concern

20   about the accruals and the missed accruals in

21   January of 2016; right?

22       A.      Yes.

23       Q.      Mr. Willis was concerned about it;

24   right?

25       A.      Yes.

APP. 0000053

BROWN, JONATHAN  *  November 21, 2018

Page 248

1    Q.    And it had an impact on him; right?

2    A.    Yes.

3    Q.    It had an impact on the Geismar plant,

4    because that meant that there was additional moneys

5    that, basically, you weren't going to have to spend

6    on maintenance because they weren't accrued right in

7    '15; correct?

8    A.    That's correct.

9    Q.    And that meant that, basically, the

10   maintenance organization was going to be in a hole

11   in 2016; right?

12             MR. JOHNSON:  Object to form.

13   A.    Possibly, yes.

14   Q.    (BY MR. GRIFFITTS)  I mean --

15   A.    I was --

16   Q.    -- that's true; isn't it?

17   A.    Well --

18             MR. JOHNSON:  Object to form.

19   A.    -- the way -- what happened was the

20   accruals was to carry over the work that they was

21   trying to perform and to make sure we still had

22   their money; but, yes.  It would have been in the

23   hole, yes.

24   Q.    (BY MR. GRIFFITTS)  But when the

25   accruals weren't done -- in fact, you thought that

APP. 0000054

BROWN, JONATHAN  *  November 21, 2018

Page 249

1    the money just carried over, didn't you?

2              MR. JOHNSON:  Object to form.

3        A.    I thought the money carried over.  I

4    know you had to do accruals.  I do.  And I -- it's

5    not that I thought that.  I thought that it should

6    be a situation where we can allow that.  That was

7    my...

8        Q.    (BY MR. GRIFFITTS)  Well, but -- but you

9    admitted that -- that you didn't understand an email

10   about natural carryover and that you didn't

11   understand that.  You admitted that on that tape

12   that you provided to us; right?

13       A.    Yes.  And the reason why I did that is

14   because I read Brenda Johnston's email.  I

15   misunderstood what she said when she explained

16   natural carryover, yes.

17       Q.    Yeah.

18       A.    But I've -- I've always known we've did

19   accruals; so when she sent that email, I'm, like,

20   "Okay, so what do you mean by it?"

21              She said "naturally carry over", so

22   I got confused by what she was saying.

23       Q.    And in the -- and in the long four-hour

24   meeting that Todd and Jim and Vanjia had with them,

25   you admitted that you didn't understand her email

BROWN, JONATHAN  *  November 21, 2018

Page 250

1   about the natural carryover, and they had explained

2   to you what the result was, which was that --

3       A.      What she meant, yes.

4       Q.      Right.

5               And so, in 2016, there was $500,000

6   that wasn't going to be able to be spent in 2016

7   because it hadn't been properly accrued in 2015;

8   right?

9       A.      That's what happened, yes.

10      Q.      Right.

11              And that was on your budget, so that

12  was going to be an obstacle that would have to be

13  overcome by you as a maintenance

14  supervisor -- superintendent; right?

15              MR. JOHNSON:  Object to form.

16      A.      No, sir.  That's not right.

17              It had to be overcome by turnaround

18  and by Brian Burt, who was responsible for

19  turnaround.

20      Q.      (BY MR. GRIFFITTS)  Okay.

21      A.      And Robert Sibley, who had the

22  turnaround budget.

23      Q.      Okay.  But, in 2016, I thought you told

24  me the turnaround was -- was -- or Sibley was put

25  back under you and the turnaround budget was still

APP. 0000056

BROWN, JONATHAN  *  November 21, 2018

Page 254

1      Q.      Okay.  So I just want --

2      A.      After the damage was done, yes, sir.

3      Q.      Fine.  I know you're blaming Robert

4    Sibley for that.  That's fine.

5                    MR. JOHNSON:  Object to form.

6      Q.      (BY MR. GRIFFITTS)  I get it.  I hear

7    you.  Okay?  That's not what my question is.

8                    My question is, going forward, in

9    2016, maintenance was 500 grand in the hole due to

10   the accrual issue, which affected everybody in

11   maintenance -- Mr. Burt, you, the Geismar

12   maintenance program -- right?

13     A.      Yes.

14     Q.      It was going to make things that much

15   harder to deal with in 2016; right?

16     A.      Yes.

17     Q.      Okay.  Now, show you what we'll mark as

18   Exhibit 14.

19                   (Exhibit 14 marked/introduced.)

20     Q.      (BY MR. GRIFFITTS)  Ask if you recognize

21   that as an email from Mr. Burt dated January 28,

22   2016; is that right?

23     A.      Yes.

24     Q.      Okay.

25     A.      What date is it again?  January --

BROWN, JONATHAN  *  November 21, 2018

Page 259

```
 1                    THE WITNESS:  I'm sorry I'm getting
 2          frustrated.
 3                    MR. GRIFFITTS:  Sir, object to the
 4          nonresponsive portion.
 5      Q.    (BY MR. GRIFFITTS)  I'm just asking
 6   questions.  My question --
 7                    MR. JOHNSON:  Object to form.
 8      Q.    (BY MR. GRIFFITTS)  -- is when you were
 9   at home, while you were given the opportunity to
10   think about whether you wanted to take a severance
11   package or do an improvement process, you were given
12   time to stay home and think about what you wanted to
13   do; right?
14                    MR. JOHNSON:  Object to form.
15      Q.    (BY MR. GRIFFITTS)  That's true; right?
16                    MR. JOHNSON:  Object to form.
17      A.    But ten weeks?  What did I tell you,
18   sir?  They had no intention of me coming back.
19                    MR. GRIFFITTS:  Object to the
20          nonresponsive portion.
21                    MR. JOHNSON:  Object to form.
22                    MR. GRIFFITTS:  Are you objecting to
23          my objection on the nonresponsive, or are
24          you objecting to the form of my objection?
25                    MR. JOHNSON:  Object to form.
```

APP. 0000058

BROWN, JONATHAN  *  November 21, 2018

Page 288

1    paragraph, "The scaffold employer in needed" -- I

2    think you meant "is needed" -- "for the every day

3    inspection and sign off on Geismar scaffolding prior

4    to use, which is a mandatory safety equipment

5    [sic]."  [As read]

6               Did I read that portion correctly?

7    A.    Yes.

8    Q.    And then Mr. Burt responds to you with a

9    response and says -- he closes it with, "Lastly,

10   scaffolding.  Why so many supposedly temporary

11   scaffolds?  I know of no other sites I've worked on

12   in my entire career with a scaffold person.  Perhaps

13   we need to build some platforms."  [As read]

14               Did I read that portion correctly?

15   A.    Yes.

16   Q.    Okay.  And the scaffolding became a

17   problem because you had scaffolding people there who

18   were -- who had set up a hammock and a place to

19   lounge in the back and not work; right?

20   A.    A hammock with a place to lounge in the

21   back and not work?

22   Q.    Well, they set up a hammock, didn't

23   they?

24   A.    Yes.

25   Q.    Okay.  And you don't approve of

APP. 0000059

BROWN, JONATHAN  *  November 21, 2018

Page 289

1    contractors coming onto your facility and setting up

2    a hammock, do you?

3         A.    No.

4         Q.    Okay.  I mean, that's totally

5    unacceptable; right?

6         A.    That's correct.

7         Q.    I'm going to show you what we're going

8    to mark as Exhibit 19.

9                   (Exhibit 19 marked/introduced.)

10        Q.    (BY MR. GRIFFITTS)  And ask you if you

11   recognize those images of pictures of the area where

12   this hammock was set up by the scaffolding guys?

13        A.    Yes, I do recognize those pictures.

14        Q.    Okay.  And that was discovered not by

15   you but by Mr. Robnik; is that correct?

16        A.    That's correct.

17        Q.    Okay.  And that was an embarrassing

18   situation because you've got -- on the facility that

19   you were in charge of maintenance on, there was a

20   hammock set up by the scaffolding guys that you had

21   contracted; right?

22        A.    Scaffolding guy that was contracted;

23   correct.

24        Q.    Yeah.  That was an embarrassing

25   situation for the Geismar plant; right?

APP. 0000060

BROWN, JONATHAN  *  November 21, 2018

Page 290

1        A.      Yes, it was.

2        Q.      And those were your contractors that you

3   were dealing with on scaffolding; right?

4                MR. JOHNSON:  Object to form.

5        A.      They were the contractor that built

6   scaffold for us, yes.

7        Q.      (BY MR. GRIFFITTS)  Yeah.  And you were

8   the one who -- who we're talking about "The

9   scaffolding employer is needed for every day

10  inspection and sign off Geismar scaffolding prior to

11  use, which is a mandatory safety requirement" [as

12  read]; right?

13       A.      Yes.

14       Q.      Right.

15               And you were the person dealing with

16  the -- I mean, that -- that came out of your

17  maintenance budget; right?

18       A.      Yes.

19       Q.      So they were your -- your contractors;

20  right?

21       A.      That's correct.

22               MR. JOHNSON:  Object to form.

23       A.      They were -- they were my contractors.

24  They were the contractors I used.  That's correct.

25       Q.      (BY MR. GRIFFITTS)  Yeah.

BROWN, JONATHAN  *  November 21, 2018

Page 291

1              And -- and it was further

2    embarrassing because Mr. Robnik discovered this

3    hammock and loafing area before you did; right?

4        A.    No.  I wouldn't say it wasn't

5    embarrassing because he discovered it before me.

6    For one thing, it wasn't appropriate, for one thing,

7    sir.  It was a break area they built for their

8    breaks.  We didn't give them approval to do that.

9    But it didn't affect their work performance.

10             And that was not on the immediate

11   site itself.  It was in an area where no one seen

12   it.  It had been there a long time.

13       Q.    Well, what did you -- what was done as

14   soon as this was discovered that this -- that this

15   lounging --

16       A.    They --

17       Q.    -- area was -- with hammock was in

18   existence?

19             MR. JOHNSON:  Object to form.

20       A.    They were removed from the site.

21       Q.    (BY MR. GRIFFITTS)  They were what?

22       A.    They were -- the scaffolding company,

23   they were removed from the site.

24       Q.    They were fired; right?

25       A.    That's correct.

BROWN, JONATHAN  *  November 21, 2018

Page 301

1   should; right?

2        A.    Yes.

3        Q.    That's a good thing for him to say;

4   right?

5              MR. JOHNSON:  Object to form.

6        A.    Yes.  Yes.

7        Q.    (BY MR. GRIFFITTS)  Okay.  Thank you.

8              Next question.  "You are a

9   knowledgeable Maintenance professional.  I believe

10  you understand the equipment and what's necessary to

11  keep it running."

12             That's a nice thing; right?  A

13  positive thing; right?

14       A.    Yes, it was.

15       Q.    And then he says, "You understand the

16  financial process."  Another nice thing; right?

17       A.    Yes.

18       Q.    All right.  So then he talks about

19  opportunities to improve.  "Work process management,

20  EAM," that was an issue that you and him and Jim had

21  discussed about how to get -- the importance of

22  getting work orders closed out in the EAM system;

23  right?

24       A.    Yes.

25       Q.    So that's a legitimate, valid concern or

BROWN, JONATHAN  *  November 21, 2018

Page 302

1    an opportunity for improvement; right?

2         A.    Yes.

3         Q.    And that's -- and as the leader of

4    maintenance, that's something that you're supposed

5    to drive to satisfaction; right?

6         A.    Yes.

7         Q.    Okay.  And he talks about, under number

8    -- c, "The analyzer program, cylinder replacement,

9    daily rounds, preventive maintenance, is

10   challenging.  I see some progress, but there's a lot

11   of catch up yet to be done."

12              Is that a fair assessment?

13        A.    Yes.

14        Q.    Okay.  "In talking to Jarrod, my opinion

15   is that the metrics around maintenance still needs

16   some work.  The closure process around I&E and

17   Mechanical are different." [As read]

18              You don't have any reason to doubt

19   that that's what he learned based on discussions

20   with Jarrod; right?

21        A.    Yes.

22        Q.    That sounds legitimate and accurate?

23        A.    Yes.

24        Q.    Okay.  And Jarrod was a contractor from

25   AIPSI that helped do scheduling; right?

BROWN, JONATHAN  *  November 21, 2018

                                                    Page 332

1        Q.      (BY MR. GRIFFITTS)  We can figure it

2   out.

3        A.      Okay.  Figure it out.  His name is

4   Carlos.

5                But when Todd Dunn became in charge

6   of that, I remember, when I first got to that

7   company, there was diversity and collusion.  We

8   talked about it all the time.  And affirmative

9   action was talked about.  It went away.  That went

10  away.  Yes, it did.

11       Q.      I'm going to come back to that.

12       A.      Yeah, you can come back to it because I

13  didn't hear it no more.  I knew -- we talked about

14  it.  I was always involved with conversations about

15  it.  That went away.

16                So it's just things like that I -- I

17  just observed, and I saw it as a racist culture.

18       Q.      Okay.

19                MR. GRIFFITTS:  Objection.

20           Nonresponsive.

21       A.      Okay.

22                MR. JOHNSON:  Object to form.

23       Q.      (BY MR. GRIFFITTS)  Here's my question,

24  sir:  You testified, under oath -- I specifically

25  asked you last time around if you ever -- if you

BROWN, JONATHAN  *  November 21, 2018

Page 334

1    pretty sure you can talk to her about it.

2         Q.    Okay.  But, so, you can't testify that

3    you mentioned it to her as of February of 2016?

4         A.    I don't recall our exact conversation.

5         Q.    Right.

6               And, in fact, as we sit here today,

7    you can't testify truthfully under oath that you

8    mentioned that anything was done to you on the basis

9    of race, to Courtni Booker, prior to April 13th when

10   you were given the PIE/PIN, can you?

11              MR. JOHNSON:  Object to form.

12        A.    I can't testify truthfully that -- yeah.

13   I -- I will say that, yeah, I -- we had a racist

14   culture.  And I think I was targeted, sir.  I was

15   targeted.

16              MR. GRIFFITTS:  Objection.

17              Nonresponsive.

18        A.    I had this --

19              MR. JOHNSON:  Object to form.

20        A.    -- performance improvement plan that was

21   given to me that was targeting me with things that I

22   knew wasn't true and I based it on my race.  I

23   really do.

24        Q.    (BY MR. GRIFFITTS)  I know you believe

25   that, sir.  I know you do.

BROWN, JONATHAN  *  November 21, 2018

Page 335

1      A.      Yeah.

2      Q.      Okay.  That's not my question, though.

3   Please listen to my question.

4               My question is, prior to April 13,

5   2016, you cannot say, under oath, truthfully, that

6   you told Courtni Booker that you thought you were

7   being discriminated against on the basis of your

8   race, can you?

9               MR. JOHNSON:  Object to form.

10      A.      I don't know.  I don't know if I

11   mentioned it, but that's what I -- I'm pretty sure I

12   have.  I don't think so, sir.

13      Q.      (BY MR. GRIFFITTS)  No, no.  I know you

14   felt that way.  That's not my question.  I know you

15   may have felt that way.  I understand that to be

16   your testimony that, in your mind, you may have felt

17   that you were discriminated against.  That's not my

18   question, though.

19               My question is, prior to April 13,

20   2016, you cannot truthfully testify that you

21   reported to Ms. Booker that you were discriminated

22   against or harassed on the basis of your race --

23               MR. JOHNSON:  Object to form.

24      Q.      (BY MR. GRIFFITTS)  -- can you?

25      A.      That, I don't recall, sir.

BROWN, JONATHAN   *   November 21, 2018

Page 336

1       Q.      Okay.  Now, let's talk about April 13th

2    and the PIE/PIN document that was provided to you,

3    which we'll mark here as Exhibit 23.

4                    (Exhibit 23 marked/introduced.)

5       Q.      (BY MR. GRIFFITTS)  Do you recognize

6    that as the performance improvement notification

7    that you received, sir?

8       A.      Yes, I do.

9       Q.      Okay.  And you met with Ms. Thomas and

10   Mr. Burt and Mr. Willis about this document and this

11   process; correct?

12      A.      Yes, I did.

13      Q.      And that was on April 13th --

14      A.      Yes.

15      Q.      -- 2016?

16      A.      Yes.

17      Q.      All right.  And you didn't record them

18   during that meeting, did you?

19      A.      No.

20      Q.      You recorded every meeting after that,

21   didn't you?

22      A.      That's correct.

23      Q.      All right.  So -- and by the way --

24   well, strike that.

25                    On this performance improvement

BROWN, JONATHAN  *  November 21, 2018

Page 337

1  notification -- first off, where was this meeting

2  held that you met with Mr. Burt, Mr. Willis, and

3  Ms. Thomas?

4        A.     It was held at an off-site location.

5        Q.     Okay.  At PDI?

6        A.     Yes.

7        Q.     Okay.  And when you met with them, they

8  explained to you that you had, under this process,

9  two different options, which were -- because of

10  concerns about your performance, that, on the one

11  hand, you had the option of taking a severance

12  package; or if you wanted to try to address the

13  concerns that they saw in performance and

14  expectation gaps that they saw, then you could be on

15  a 90-day performance improvement process; correct?

16       A.     Yes.

17       Q.     All right.  And would you agree

18  that -- first off, that's not the first time that

19  someone at Praxair has given those, kind of, two

20  options of severance plan or 90-day improvement

21  process; right?

22       A.     I wasn't aware of any other ones, to be

23  honest with you, sir.  And I do know that the

24  performance improvement plan process is just what I

25  know about them.

BROWN, JONATHAN  *  November 21, 2018

Page 338

1                When this was given to me, I don't
2    think it was with the intentions of me taking
3    this -- this PIN because we -- when she presented it
4    to me -- they presented it to me.  They didn't talk
5    about it.  They didn't want -- and I had to tell
6    them, "I want to go over this before you just give
7    me a severance package."
8                Because they -- they presented this
9    to me, didn't read it over with me, pushed it aside,
10   and said, "We've got this severance package."
11               That's how that was presented to me.
12        Q.     Okay.
13        A.     And when Brian Burt would sit in
14   there -- and she can attest to this -- I said, "I
15   don't agree with this.  This is totally
16   unacceptable."  I said, "You never communicated with
17   me.  You never told me your expectation.  We never
18   had that meeting.  And then for me -- for you to
19   come and give me your expectation in a PIN," I told
20   them, "that's not acceptable."
21        Q.     Okay.
22        A.     And he had no answer for me.
23        Q.     Okay.
24        A.     After that meeting, I didn't see him
25   again, and that was very frustrating to me.  You

BROWN, JONATHAN  *  November 21, 2018

Page 345

1          Q.      (BY MR. GRIFFITTS)  Okay, yeah.

2                  Now, in this document -- first off,

3      when they met with you, they were trying to explain

4      to you what your options were, and I'm talking about

5      on April 13th.

6          A.      Yes.

7          Q.      And they were trying to explain to you

8      the two options that you had, one of which was a

9      severance agreement; and one of which was, if you

10     want to stick around and try to improve these

11     concerning areas, then, you know, you would be on a

12     90-day performance plan; right?

13         A.      Yes.

14         Q.      You understood that that's what was

15     facing you; right?

16         A.      Yes.

17         Q.      And what they did was, they told you to

18     go home and think about which one of these routes

19     that you wanted to go down, because it was an

20     important decision for you and your family; right?

21         A.      Yes.

22         Q.      And two days later, you filed a

23     complaint of -- a complaint through the corporate

24     security, didn't you?

25         A.      Yes.

BROWN, JONATHAN  *  November 21, 2018

Page 346

1        Q.        Okay.  And then while you were taking

2    time off to decide whether or not you wanted to take

3    the severance program or take the performance

4    improvement plan --

5        A.        Uh-huh.

6        Q.        -- you communicated with Vanjia Thomas,

7    didn't you?

8        A.        Yes.

9        Q.        Okay.  By the way, we established

10   earlier that during that time off, while you were

11   thinking about that, you were given the

12   opportunity -- or I mean, you were paid your same

13   salary, no reduction in pay; correct?

14       A.        Correct.

15       Q.        All right.  I'm going to show you what

16   we're marking as Exhibit 24.

17                      (Exhibit 24 marked/introduced.)

18       Q.        (BY MR. GRIFFITTS)  And ask if you

19   recognize Exhibit 24 as an email exchange between

20   you and Ms. Thomas?  Do you recognize that as an

21   email exchange with her in April of 2016?

22       A.        Yes.

23       Q.        Okay.  Now, earlier, Mr. Brown, you were

24   critical of the company.  You said they put you on

25   leave for ten weeks, and that that was indication

BROWN, JONATHAN  *  November 21, 2018

Page 349

1   more time I need.

2              Correct?

3        A.      Yes.  Yes.  Yes.  That's correct.

4        Q.      And then you didn't reach out to her

5   again until she reached out to you weeks later to

6   bring you in to sit down for the four-hour meeting

7   y'all had; correct?

8        A.      That, I don't recall.  I don't know the

9   time I reached out to her.

10       Q.      Well, certainly -- well, you didn't

11  reach out to her and say, "Hey, I thought about

12  this.  I want to go ahead and come back to work.  I

13  made my decision.  I'm coming back to work.  Can I

14  start next week?"

15              You didn't ever do that, did you?

16       A.      I did reach out to her, sir, and told

17  her that I was going to go ahead with the

18  performance improvement plan; as to when I did that,

19  I don't know.

20       Q.      Right.

21              And when you -- when y'all finally

22  communicated, she didn't delay.  Y'all had a

23  meeting.  And it was a meeting with you and her and

24  Todd -- and Todd Dunn; correct?

25       A.      Yes.

BROWN, JONATHAN  *  November 21, 2018

Page 354

1    but you're a -- you're a superintendent.  You've got

2    to figure out how to lead and manage your people;

3    right?

4         A.    Sir --

5         Q.    That's true, isn't it?

6         A.    -- I know how to lead and manage my

7    people.  I'm superintendent.  And I do a good job of

8    that.  And anybody who work for me can attest to

9    that.

10              But what I'm trying to tell you is,

11   you don't take your deficient and expectation and --

12   who oversee -- who oversaw this?  Who you assign to

13   oversee this?

14              If it's not my supervisor who wrote

15   this, who gave this to me, who signed this, and said

16   these are my deficiencies -- I need him overseeing

17   me, getting feedback from me to know what I do, and

18   you assign a guy who hadn't been at the company but

19   a month.  He's learning from me, sir.  How is he

20   going to observe my performance when he doesn't know

21   what I do?

22        Q.    You met -- you had telephone

23   conversations.

24        A.    A telephone conversation isn't the way

25   to do it, sir.

BROWN, JONATHAN  *  November 21, 2018

Page 356

1                    MR. JOHNSON:  Form.

2        Q.    (BY MR. GRIFFITTS)  Jim Willis

3   understands your job; right?

4                    MR. JOHNSON:  Object to form.

5        A.    Yes, he does.

6        Q.    (BY MR. GRIFFITTS)  He does; is that

7   true?

8        A.    Yes.  Yes.  But Jim Willis wasn't

9   getting day-to-day feedback from me, sir.

10       Q.    Jim Willis was not getting -- Jim Willis

11   was not getting feedback from you?

12       A.    Craig Robnik was seeing me every day at

13   a certain time when he could make it, and he would

14   go -- he would ask me what was I was do -- what did

15   I do for the day.

16       Q.    Uh-huh.

17       A.    And it got to a point to where I

18   explained to him what I was doing, how I was doing

19   it.  And then I finally asked -- told him, "Well,

20   what are your suggestions?  You aren't giving me any

21   feedback," which he wasn't doing.

22       Q.    This is who?  Robnik or --

23       A.    Robnik.  And, I think, Jim was calling

24   me, if I'm not mistaken, every Thursday of

25   every -- I forget the time frame.

APP. 0000075

BROWN, JONATHAN  *  November 21, 2018

Page 357

1              But Craig Robnik was my everyday

2     observer and the person that talked to me.  And all

3     I was doing with him was telling him what I was

4     doing every day.

5         Q.    Okay.

6         A.    And I actually stated that to him.  I

7     said, "All we doing here -- I'm just telling you

8     what I do every day.  I'm just -- you're learning

9     how I work and what I do."

10             So I didn't understand how was that

11    effective of -- in observing my performance.  I just

12    didn't understand that.

13        Q.    So you thought that they were -- you

14    thought that they were incompetent in how they

15    handled the performance improvement process?

16        A.    That's exactly right, sir.

17        Q.    Okay.  I'll show you what we'll mark as

18    Exhibit 25.

19             (Exhibit 25 marked/introduced.)

20        Q.    (BY MR. GRIFFITTS)  You just testified

21    under oath to the ladies and gentlemen of the jury

22    that are going to see this videotape that you didn't

23    have day-to-day contact with Mr. Willis; is that

24    correct?

25             MR. JOHNSON:  Object to form.

BROWN, JONATHAN  *  November 21, 2018

Page 360

1    families; right?

2         A.    Gotcha.

3         Q.    A call on July 5th, "(Jim at Geis" --

4    or, excuse me, not a call.

5              "(Jim at Geismar with Jonathan)," on

6    July 5th; right?

7         A.    Yes.

8         Q.    July 6th, where were you guys?

9    "Discussion Notes (Jim and Jonathan in Geismar)";

10   right?

11        A.    Yes.

12        Q.    July 7th -- this is on the bottom of

13   page 343.

14        A.    Uh-huh.

15        Q.    -- "(Jim and Jonathan via phone)."

16        A.    I gotcha.

17        Q.    Okay?

18        A.    Yes, sir.

19        Q.    So when you testified that you didn't

20   have day-to-day communication with Jim Willis, not

21   even five minutes ago, that was flat false, wasn't

22   it?

23        A.    Yes, it was.

24              MR. JOHNSON:  Object to form.

25        A.    I said I didn't recall.  You're asking

BROWN, JONATHAN  *  November 21, 2018

Page 361

1   me stuff, sir, that was years ago.  And everything

2   that happened then, I don't recall.  And that's why

3   I'm saying that.  I'm not saying this is an accurate

4   statement.

5             Some of the stuff I say, I don't

6   remember.  I'm going to tell you that.  I don't know

7   if it might have been when Vanjia called every

8   Thursday.  I -- I -- it was a meeting we had every

9   Thursday or every Wednesday, whenever it was.

10            And I do remember seeing Craig

11  Robnik every day at work at the end of the day.

12            Now, whether I discussed with Jim, I

13  don't quite remember a lot of that; but thank you

14  for bringing that to my attention.

15       Q.   (BY MR. GRIFFITTS)  Yeah.

16            And we do have a whole bunch of

17  tapes, thank God, that show --

18       A.   Yes.

19       Q.   -- exactly what was said and exactly the

20  tenor of those --

21       A.   Yes.

22       Q.   -- very cordial and professional

23  conversations with Jim Willis, weren't they?

24            MR. JOHNSON:  Object to form.

25       A.   Yeah, we had conversations.  Quite a few

APP. 0000078

BROWN, JONATHAN  *  November 21, 2018

Page 362

1    conversations.

2         Q.    (BY MR. GRIFFITTS)  They were -- those

3    conversations were very cordial and professional?

4              MR. JOHNSON:  Object to form.

5         A.    Yeah.

6         Q.    (BY MR. GRIFFITTS)  Weren't they?

7         A.    They were professional.

8              MR. JOHNSON:  Object to form.

9         A.    That's how I am.  I am professional.

10        Q.    (BY MR. GRIFFITTS)  Okay.  Well --

11        A.    No matter how -- how -- what mood I'm

12   in, I'm going to be cordial, and I'm going to be

13   professional.

14        Q.    Yeah.

15        A.    That's just me.

16        Q.    And, in turn, when you had the calls,

17   again, the ones that we have recorded, Jim Willis

18   was professional with you in every one of those

19   calls?

20        A.    Yes, he was.  Jim Willis is a

21   professional person.  He --

22        Q.    Todd Dunn was professional with you in

23   every one of those meetings or calls?

24              MR. JOHNSON:  Object to form.

25        Q.    (BY MR. GRIFFITTS)  True?

BROWN, JONATHAN  *  November 21, 2018

Page 363

1                    MR. JOHNSON:  Object to form.

2        A.      There was times where the one -- the

3    time -- I didn't see professionalism sometimes.  And

4    I can tell you when it got to the point where I was

5    being accused of things that was known issues at

6    that plant, to me, that's the part that wasn't

7    professional.

8        Q.      (BY MR. GRIFFITTS)  Okay.  But he didn't

9    raise his voice.  He did not yell at you --

10       A.      No.

11       Q.      -- and did not speak to you in an

12   unprofessional manner, did he?

13       A.      No.

14       Q.      You might have disagreed with what he

15   was saying, but he treated you respectfully and

16   professionally; right?

17       A.      Right.  We were all treating each other

18   respectfully.

19       Q.      Okay.

20       A.      Yeah.

21       Q.      And the same with Ms. Thomas, in every

22   meeting and every call that you had with her during

23   the PIE/PIN process, she treated you cordially,

24   professionally, and respectfully?

25       A.      Yes.

BROWN, JONATHAN  *  November 21, 2018

Page 364

```
 1      Q.     Okay.  Now, back to the expectations.
 2  One of the main ones under conflict management,
 3  of -- one of the first ones, it talks about, "Drive
 4  techs to deliver on known goals in implementation of
 5  Electronic Asset Management deliverables.  (EAM work
 6  orders close out in a timely manner.)"
 7              Did I read that correctly?
 8      A.     Yes.
 9      Q.     And as we've discussed before, and as
10  you had discussions time after time on those tapes,
11  we knew that we had an issue with getting our techs
12  to do the work orders in EAM correctly; right?
13      A.     That's correct, sir; but let me explain
14  one other thing with that too.
15              The problem we have -- man, I wish
16  you could understand everything in this --
17      Q.     Oh, I understand, sir.
18              MR. JOHNSON:  Objection.
19      A.     No, I don't think you do, sir, because
20  you -- you didn't work maintenance at the plant.
21  You understand law; you don't understand
22  maintenance.  So -- but let me explain.
23              The EAM process is a work process
24  that I put together at Geismar, and I'm very
25  knowledgeable of it.  And I drove Geismar from 2,500
```

APP. 0000081

BROWN, JONATHAN  *  November 21, 2018

                                             Page 367

1   order for us to do it again, we had to hire Praxair

2   I&E technicians.

3             MR. GRIFFITTS:  Objection.

4         Nonresponsive.

5             MR. JOHNSON:  Object to form.

6         Q.    (BY MR. GRIFFITTS)  Mr. Brown, you

7   referenced earlier your valuable tech who wasn't

8   very good at work orders.  That was Jason Peno;

9   right?

10        A.    He wasn't good with -- yes.

11        Q.    Right.  Right.

12              And y'all had continuous discussions

13  about the fact that Peno was not getting his work

14  orders in; right?  That wasn't just one discussion.

15  It was over time --

16        A.    We had -- we had --

17        Q.    -- repeatedly; right?

18        A.    Yes.

19        Q.    Right.

20              And you never required Jason Peno to

21  complete all LMS training modules associated with

22  EAM qualifications, did you?

23        A.    No, I didn't.

24        Q.    Right.

25              Even though that was recommended to

APP. 0000082

BROWN, JONATHAN  *  November 21, 2018

Page 368

1   you to do?

2        A.     Right.

3        Q.     Okay.  And you also talked about you

4   never had the right people because you needed more

5   Praxair employees; correct?

6        A.     Yes.

7        Q.     And isn't it true that Mr. Willis told

8   you that the -- to be able to justify more

9   employees, you had to justify it with the numbers,

10  which was how you do it through getting EAM up to

11  speed and getting the work orders pushed through?

12              He basically told you you had to

13  show that we have the need for the full-time

14  employees, didn't he?

15       A.     Sir, no.

16       Q.     We had to be able to prove it.

17       A.     No, sir.  Listen to the recording.  Jim

18  Willis actually stated -- and he agreed with

19  me -- that I was not allowed to bring in Praxair I&E

20  technicians, no matter what.  And I was told that if

21  we needed more technicians, we had to get

22  contractors.

23       Q.     Okay.

24       A.     And we knew that was a problem.

25       Q.     Okay.  So it sounds to me like there was

APP. 0000083

BROWN, JONATHAN   *   November 21, 2018

Page 374

 1      A.      Go ahead.

 2      Q.      Clearly, you don't like how a lot of

 3  people did their job at Praxair.  And you're

 4  entitled to that opinion, sir.  You certainly are.

 5              But my question is, what you just

 6  told me about this dog and pony show with other

 7  people when the vice presidents would come in,

 8  you're not claiming that that has anything to do

 9  with the color of your skin or harassment or

10  discrimination towards you, are you?

11              MR. JOHNSON:  Object to form.

12      A.      Again, sir, I don't understand this

13  whole deposition about my claim of racist culture in

14  there.

15              You folks is on all these little

16  details of me being in meetings, the details of me

17  knowing EAM.  I'm trying to understand where we

18  getting to with the fact that there's a racist

19  culture within the organization.  There's black guys

20  there who are not getting the same treatment as the

21  white employee.

22              A good example, Mr. Brian Burt, I

23  heard he was removed from his position.  I don't

24  know how true that is.  Vanjia can probably talk on

25  that, and I'm pretty sure she will later.  Was he

BROWN, JONATHAN  *  November 21, 2018

Page 375

1    put on a performance improvement plan?  No.

2                   What tend to happen -- and I've seen

3    this.  I observed this -- a lot of times those guys

4    are put into a position where they can be

5    successful.  They don't get pushed out.

6                   If you black, you going to get

7    pushed out.  You're going to get a severance

8    package.  I've seen it happen to several of them.

9    And maybe it's just because it's the ones I know and

10   I'm familiar with, and I talk to a lot of them.

11   Maybe thems the only ones I know about.  But I do

12   know it happened with black employees a lot.  And I

13   have witnessed and observed white employees, when

14   they wasn't competent, wasn't doing a good job in

15   their position, they would move somewhere where they

16   could be successful.  It happened to one of my

17   subordinates that I wanted fired.  The guy you

18   mentioned, Jason Morales, they wanted information

19   on, who was late for work all the time.

20                   Now, I wasn't there at that plant to

21   see what he did every day.  He was being late for

22   work.  I called him in.  I gave him verbal

23   counseling.  I told him if it happened again, we're

24   going to terminate him.  And after that, come to

25   find out that it was happening again.  It was never

BROWN, JONATHAN  *  November 21, 2018

Page 376

1   reported to me.

2                    The guy that was there at the

3   site -- let me finish -- who was the plant

4   superintendent, he knew about it.  And when it

5   finally came down to it, when we brought him in to

6   talk about some of the things that had occurred,

7   they asked him, and I asked him why didn't he report

8   me.  He said he didn't to want to see nobody get

9   fired.  That was his answer to that question.

10                   So I think they might have counseled

11  him on that as well, but he wasn't put on a

12  performance improvement plan.  And --

13       Q.    (BY MR. GRIFFITTS)  Morales?

14       A.    No.  I'm talking about the plant

15  superintendent who allowed him to get away with

16  that.

17       Q.    But Morales was your employee --

18       A.    Let me finish now.

19       Q.    -- right?

20       A.    Let me finish.

21       Q.    That's true; right?

22       A.    Let me finish.  Yeah, he was my

23  employee.

24                   So when it got to my attention,

25  Vanjia and them came to the site.  James Willis came

BROWN, JONATHAN  *  November 21, 2018

Page 400

1      A.      I don't recall, sir.  It was sometimes
2   in July.  I don't know when, though.
3      Q.      July.
4      A.      I'm not sure.
5      Q.      Okay.  Now, we spoke earlier of -- you
6   indicated the other information that you believe
7   was -- that your inclusion in the PIE/PIN was based
8   on your race.
9              You mentioned that there were no
10  longer affirmative action at Praxair as of -- that
11  was April of 2016.  That's -- that's not your
12  testimony, is it?
13     A.      Well, what I'm stating is I know we
14  talked -- we heard about it.  It was well
15  communicated, especially -- more so diversity and
16  inclusion.  It was always a topic of discussion.
17  And it was always brochures, flyers, emails.  And it
18  went away is what I'm saying.
19     Q.      What -- when -- actually, let me
20  ask -- are you saying something actually happened,
21  or you just noticed the flyers and the brochures and
22  the activity around diversity and inclusion and
23  affirmative action less?
24     A.      It left after we got the new regime in.
25     Q.      What new regime?

APP. 0000087

BROWN, JONATHAN  *  November 21, 2018

Page 401

1    A.    It's when Jim Willis, Todd Dunn got
2    promoted up.
3    Q.    Okay.  What evidence do you have that
4    anything changed between -- before Jim and Todd got
5    promoted up?  What evidence do you have that
6    anything with respect to the company's diversity and
7    inclusion or affirmative action efforts changed
8    after that point in time?
9    A.    Well, it wasn't talked about, sir.  What
10   I'm saying is, we talked about it quite a bit.  It
11   was something we usually always get in emails.  And
12   I'm not -- I'm not sure, but I want to say there was
13   a -- like, almost like a computer base -- not -- it
14   could have been a train -- not so much as a
15   training, but I think there was a presentation on it
16   that we used to always review.
17         We talked about harassment in the
18   workplace.  We talked about just a lot of things
19   that just seemed to disappear --
20   Q.    Okay.
21   A.    -- and, like, you had mentioned -- now,
22   I didn't have any evidence or nothing, as far as a
23   form, a paperwork-type, saying that Jim -- Jim
24   Willis was discriminating against me, but he -- I
25   know that Jim Willis knew about affirmative action

BROWN, JONATHAN  *  November 21, 2018

Page 402

1   and diversity and inclusion, so that's just my

2   observation.  And what I've observed, you know, is

3   just all of that went away.  It wasn't talked about

4   anymore.

5       Q.    Okay.  Well, you can -- the company

6   continued to have ERGs -- employee resource

7   groups -- that were for diversity and inclusion;

8   right?

9       A.    I didn't see anything else on that after

10  that promotion happened, sir.

11      Q.    Okay.  Well, you say "after the

12  promotion."

13            Do you have any information or

14  evidence that links what you perceive to be less

15  diversity and inclusion activity -- do you have

16  anything that links that to a decision made by Jim

17  Willis or Todd Dunn, other than your subjective

18  belief that you think you saw less of it after that?

19      A.    Well, I know Ms. Vanjia Thomas is one

20  who is also responsible for ensuring that that's

21  communicated, diversity and inclusion and

22  affirmative action.  And I know that's part of their

23  roles, responsibilities, to make sure everyone

24  understand that.

25      Q.    Sir, my question was, do you have

BROWN, JONATHAN  *  November 21, 2018

Page 403

1   anything that links what you perceive to be a

2   reduction in diversity and inclusion efforts to a

3   decision made by Jim Willis and Todd Dunn, and you

4   are -- you gave me an answer about Vanjia Thomas.

5   That's not what I'm asking, sir.  Please answer the

6   questions.

7              I'll ask it again so that it's real

8   clear.  I'm not trying to play games here.  I'm

9   trying to be real clear.  I'm just trying to find

10  out -- you said, in your belief, you -- your

11  opinion, you saw less discussion about diversity and

12  inclusion after Jim and Todd were promoted.

13              And my question to you is, do you

14  have anything -- any evidence that either one of

15  them made any decision whatsoever dealing with

16  increasing/decreasing emphasis on diversity and

17  inclusion in the workplace?

18      A.      Evidence, no.  No evidence, other than

19  what -- basically, what I was trying to say, that

20  there was no evidence of diversity and inclusion and

21  affirmative action anymore, is what I was saying.

22      Q.      Okay.

23      A.      I was seeing, at first, in email

24  conversation.  That's basically what I was saying.

25      Q.      And give me the date that you claim that

BROWN, JONATHAN  *  November 21, 2018

Page 408

```
 1            with the question, Counselor.  Can you let
 2            me finish my question?
 3       Q.    (BY MR. GRIFFITTS)  My question to you,
 4    sir, is -- again, just limited to Brian Burt and no
 5    one else.  Okay?
 6       A.    Yes.
 7       Q.    My question is, what evidence do you
 8    have that he made any decision with regard to
 9    placing you on the PIE/PIN because of your race?
10            MR. JOHNSON:  Object to form.  And
11            let him answer the question.
12       A.    I don't -- I can't answer no better than
13    what I just did.  That this, in itself, is evidence.
14    Like I said, it's inaccurate.  Very inaccurate.
15       Q.    (BY MR. GRIFFITTS)  Okay.  So --
16       A.    So what -- I guess what I'm saying --
17            MR. JOHNSON:  Let him finish.
18       A.    What other reason --
19            MR. GRIFFITTS:  I didn't say
20            anything, Counsel.  You let him finish.
21            MR. JOHNSON:  Go ahead, Mr. Brown.
22       A.    All I'm looking at, sir, is the fact
23    that out of all the maintenance superintendents, all
24    I'm stating is I'm the only one that he chose to do
25    this to.
```

APP. 0000091

BROWN, JONATHAN  *  November 21, 2018

Page 409

1          Q.     (BY MR. GRIFFITTS)  Okay.

2          A.     That's what I'm saying.

3          Q.     So I think I understand your testimony

4     is, you think that because you were put on a PIE/PIN

5     and other maintenance superintendents at different

6     plants were not, that's your evidence that Mr. Burt

7     did this because of your race?

8                     MR. JOHNSON:  Object to form.

9          A.     Not my only evidence.

10         Q.     (BY MR. GRIFFITTS)  Okay.  Well, then,

11    that's -- sir, that's what I'm trying to find out.

12    Okay?

13         A.     Yes.

14         Q.     So is --

15         A.     Yes.

16         Q.     -- is that one piece of evidence that

17    you point to?

18         A.     Yes.

19         Q.     Okay.  So we're going to drill in on

20    that one in a second; but right now, you've told me

21    that's one piece of evidence, that you think other

22    superintendents didn't get put on a PIE/PIN, and you

23    were.  And you're African-American.

24                     So my question is, other than that,

25    what other information do you have that supports

BROWN, JONATHAN  *  November 21, 2018

Page 410

1    your belief that you were discriminated against by

2    Mr. Burt -- again, just by Mr. Burt --

3         A.      Okay.

4         Q.      -- on the basis of your race?

5         A.      The fact that Mr. Burt making these

6    accusations about me without ever communicating with

7    me, without ever sitting down before me, without

8    ever talking to me, that's more evidence that he,

9    for some reason, didn't want to face me.

10                     And he appeared to be talking to the

11   other superintendents, but for -- he didn't -- he

12   didn't talk to me.

13        Q.    Okay.  So I've got other people weren't

14   put on a PIN.  I've got he didn't talk to you.

15                     Is there any other information that

16   you rely upon to support your belief that Mr. Burt

17   was involved in putting you on a PIN on the basis of

18   your race?

19        A.    No, I don't have anything else, sir.

20        Q.    Okay.  So with regard to -- let's take

21   the last one first.

22                     You say that Mr. Burt didn't

23   communicate any of that to you; but, of course,

24   there -- it is a true statement, is it not, that

25   there's more than just in-person or even

APP. 0000093

BROWN, JONATHAN  *  November 21, 2018

Page 411

1   over-the-telephone communications; true?  That's a

2   true statement, isn't it?

3       A.     That was more than in-person?

4       Q.     There's more than just in-person or

5   telephone -- telephonic communications; true?

6       A.     Yeah, there are more than just

7   in-person.

8       Q.     Okay.  And one of the things -- and, in

9   fact, maybe even a criticism of Mr. Burt is that he

10  sent a lot of emails; right?

11      A.     Yes.  Nothing pertaining to this, sir.

12      Q.     Okay.  Well, I mean, he communicated to

13  you regarding the PIN, regarding -- y'all

14  communicated a bunch about work orders, for example;

15  right?  Via email; right?

16      A.     Yes, we did.  We did some.

17      Q.     Okay.  So y'all communicated about a

18  variety of things that he thought needed to change,

19  but he just -- he may have done so, some of which

20  via email; right?

21      A.     Yes, he did.

22      Q.     Okay.  And when you say he never talked

23  to you, of course, sometimes he would call you on

24  the phone.  Right?

25      A.     Occasionally.

APP. 0000094

BROWN, JONATHAN  *  November 21, 2018

Page 412

1        Q.      Yeah.

2                And sometimes he would be in the

3    plant and meet with you in person; right?

4        A.      That hardly ever happened.  That was one

5    of my major complaints.

6        Q.      Okay.

7        A.      He would come to the plant and would not

8    meet me in person.

9        Q.      Okay.  Well, and I understand you're

10   entitled to criticize his management skills all you

11   want to; but when you say, "He never communicated

12   with me about the issues that are in the PIN,"

13   before you were given the PIN, that's not exactly

14   true.

15               He communicated to you -- sometimes

16   in person, sometimes on the phone, and sometimes via

17   email -- about issues that are included in here;

18   correct?  That's true, isn't it?

19       A.      Some of the issues.  But, sir, let me

20   say something, sir.  I'm going to give you a good

21   example.  Exhibit 23, at the bottom --

22       Q.      Yes, sir.

23       A.      -- you just read to me earlier what

24   Mr. Burt stated, that I was very knowledgeable about

25   the finances and how well I was with it and

APP. 0000095

BROWN, JONATHAN  *  November 21, 2018

Page 416

1    from?

2          A.      It was the West Texas plants.

3          Q.      Okay.

4          A.      The ones west of the city.

5          Q.      Okay.  Anybody else other than those

6    three guys that you point to?

7          A.      Those are the only superintendents.

8          Q.      Okay.  So with regard to those three

9    guys, it's true to say, number one, that you don't

10   know the full details of how good or how bad they

11   were at running their particular plants because you

12   didn't supervise them?

13         A.      I don't know the full details, no.

14         Q.      So it's true to say, as we sit here

15   today, you don't know whether Mr. Willis thought

16   that they were -- or Mr. Burt thought they were

17   doing a good job or a bad job or a job that merited

18   being put on a PIE/PIN or a job that merited being

19   terminated, do you?

20         A.      I know they weren't merited of being

21   terminated.  I know they weren't put on a PIE/PIN.

22         Q.      Did you think they deserved to be?

23         A.      Well, I didn't think I deserved to be,

24   is all I'm speaking on behalf of, sir.  And what I'm

25   stating by that, I know I had a much bigger

BROWN, JONATHAN  *  November 21, 2018

Page 422

1   his responsibility, from a maintenance standpoint,

2   so he's got to be able to report that up the chain.

3           So when he says, "I need an

4   explanation on June spending for SELA.  Please

5   discuss and give me an update ASAP," that's a

6   legitimate question for him to ask as your boss's

7   boss; right?

8           MR. JOHNSON:  Object to form.

9       A.    Right.

10      Q.    (BY MR. GRIFFITTS)  And it's not, in any

11  way, accusatory to you about what was spent; it's

12  just, "I need an explanation of what was spent";

13  right?

14      A.    Yes.

15      Q.    Okay.  And for -- and secondly, if you

16  read the "In Geismar, We are" -- he lists out the

17  numbers in St. Charles, what they are.

18          Now go back to where we were, sir.

19  Do you have any reason that -- the data points,

20  like, when he says, "We were $80,000 over budget on

21  maintenance materials," and everything he writes

22  about Geismar and St. Charles, any reason to dispute

23  that his data points there are true?

24          MR. JOHNSON:  Object to form.

25      A.    To dispute it?  No, I don't have any

BROWN, JONATHAN  *  November 21, 2018

Page 423

1   reason to dispute it.

2       Q.    (BY MR. GRIFFITTS)  Yeah, I mean --

3       A.    I don't.

4       Q.    And when he says, "We were 80,000 over

5   budget on maintenance materials.  We were 10,000

6   over budget for contract labor.  Of the 82,500 shown

7   in UPM, only 36,000 of it is legitimate UPM work

8   order spend.  The other 46,500 is direct bill to the

9   account, which should all be reclassed out."  [As

10  read]

11              Did I read that portion correctly?

12      A.    Uh-huh.

13      Q.    Do you have any reason to dispute

14  that's -- those are all true statements?

15              MR. JOHNSON:  Object to form.

16      A.    I -- I -- no, I don't have a reason to

17  dispute it.

18      Q.    (BY MR. GRIFFITTS)  Okay.

19      A.    But I can't recall what --

20      Q.    Okay.  So he gives a legitimate question

21  regarding data points that you don't dispute?

22      A.    Uh-huh.

23      Q.    You responded, "Jim, I reviewed the June

24  spending and I can't provide immediate details on

25  this at this moment.  These charges occurred in May

APP. 0000098

BROWN, JONATHAN  *  November 21, 2018

Page 434

1   when he said he was being transparent and when he

2   was saying that I'm not going to make it through the

3   performance improvement plan.  Hey, you telling me

4   you're going to terminate me.  My days were

5   numbered.  And I knew that.

6          Q.     Okay.

7                 MR. GRIFFITTS:  Objection to the

8            nonresponsive portion.

9          Q.     (BY MR. GRIFFITTS)  My question was --

10                MR. JOHNSON:  Object to form.

11         Q.     (BY MR. GRIFFITTS)  -- why was it that

12  you did this on July 13th?

13         A.     I just said that's why.

14         Q.     Okay.  Well, you already had a job offer

15  and a job lined up with AkzoNobel; right?

16         A.     I don't know when I had the job lined

17  up, sir.

18         Q.     Well, let's take a look, sir.

19         A.     That, I don't recall.  I was

20  entertaining AkzoNobel, and I was entertaining an

21  energy company --

22         Q.     Well, you ended up --

23         A.     -- just in case.

24         Q.     You ended up taking the AkzoNobel job;

25  correct?

BROWN, JONATHAN  *  November 21, 2018

Page 435

1     A.     I ended up taking the AkzoNobel job;
2  that's right.
3     Q.     All right.  I'm going to show you what
4  we'll mark as -- what is that? -- Exhibit No. 28.
5            (Exhibit 28 marked/introduced.)
6     Q.     (BY MR. GRIFFITTS)  And ask you if you
7  recognize that as a job offer letter to you from
8  AkzoNobel?
9     A.     Yes.
10     Q.     And it's dated June 20, 2016, is it not?
11     A.     Yes.
12     Q.     And the tentative start date is July 25,
13  2016; correct?
14     A.     Yes.
15     Q.     So basically that was 12 days out from
16  your letter of resignation; right?
17     A.     Yes.
18     Q.     And you even said, "Please accept" -- in
19  your letter of resignation.  "Please accept this as
20  my two-week notice of resignation.  My last day of
21  work will be July 27th..." [As read]
22            Is that right?
23     A.     Yes.
24     Q.     How were you going to work at -- at
25  Praxair through July 27th when you had a start date

BROWN, JONATHAN  *  November 21, 2018

Page 440

```
 1        A.      Yes.

 2                MR. JOHNSON:  Object to form.

 3        A.      Some benefits for Praxair, but I have

 4   medicals from military.

 5        Q.      (BY MR. GRIFFITTS)  Okay.  What -- any

 6   benefits that you got at -- or that you had at

 7   Praxair that you don't have at AkzoNobel?

 8        A.      No.

 9        Q.      And as I see it, it looks like, as far

10   as -- forget rate of pay.  It looks like days of pay

11   you missed maybe, max, two or three days of pay

12   because you're paid through July 27th at Praxair,

13   and you started August 1 with AkzoNobel?

14                MR. JOHNSON:  Object to form.

15        A.      I believe so.  I'm not sure.

16        Q.      (BY MR. GRIFFITTS)  Okay.  Now, you

17   testified earlier that Mr. Dunn told you that he's

18   being transparent, and that you're not going to get

19   through the performance review?

20        A.      Yes.

21        Q.      Okay.  Sir, you realized when you

22   testified to that you were under oath; right?

23        A.      I know I was under oath.

24        Q.      And you realize that when you testified

25   to that, we finally have, thanks to the court, the
```

BROWN, JONATHAN  *  November 21, 2018

Page 441

1  transcripts that show exactly what Todd said; right?

2      A.    Okay.

3      Q.    I'll show you what we'll mark as Exhibit

4  No. 29.

5              (Exhibit 29 marked/introduced.)

6      Q.    (BY MR. GRIFFITTS)  Take a look at page

7  169 of that transcript, please.  And, actually,

8  let's start at the top of page 168.

9              Todd says:  "Without the maintenance

10  director or somebody else coming through and noticed

11  somebody sitting on the porch smoking a lot.  That's

12  an accountability that you're going to have"

13  -- "that you're going to have if you're taking the

14  role going forward that you have to embrace that.

15  And if you don't, you're not going to be successful.

16  And we're going to be having a very different

17  conversation.

18              "So I don't want to go into an

19  improvement plan not understanding what their

20  expectation is.  That's what I told you yesterday.

21  I'm trying to make sure you understand today so that

22  if you're -- if you've got reservations about it,

23  you need to consider the package that -- that are in

24  front of you because the expectation is not going

25  away."  [As read]

APP. 0000102

BROWN, JONATHAN  *  November 21, 2018

Page 442

1              Did I read that portion correctly?

2    A.      Uh-huh.

3    Q.      And he says:  "I don't -- it's only

4    going to get more and more better performance

5    expected as we go forward.  So I'm trying to be very

6    transparent."  [As read]

7              Did I read that portion correctly?

8    A.      Uh-huh.

9    Q.      Okay.  So he never said that you weren't

10   going to make it through the program.  He said that

11   the expectations were going to be higher, and that

12   if you had reservations, that you needed to consider

13   taking the package; true?

14   A.      Yes.

15   Q.      Okay.  So he never -- and, in fact, the

16   other thing that he told you was that he believed

17   that you were capable of achieving the terms of

18   the -- of the program, didn't he?

19   A.      I think so.  I'm not --

20   Q.      Okay.  Well, let's take a look.

21              Go to page 261.  You got it?  Let's

22   look at the second -- after you say:  "Mm-hmm."

23              He says:  "I just don't want to get

24   to a point where there's only one option on the

25   table, and it's a very different discussion and you

BROWN, JONATHAN  *  November 21, 2018

Page 443

1   never had a chance to really think through the

2   options."

3                    "Yeah."

4                    "So..."

5                    And Ms. Thomas says:  "That's why we

6   want to give you some more time..."

7                    And he says:  "I think, I think we

8   want to give you a couple days to really think about

9   it, go in completely eyes open, and then we'll, you

10  know, we'll go from there.  But there's no ulterior

11  motive behind any of this.  We just want to be fair

12  and clear and make sure that this is the job you

13  want to do, the job we described is the one you want

14  to do." [As read]

15                   You say:  "Right."

16                   And he says:  "I" -- "And I think

17  you're capable of doing, and you're willing to be

18  accountable to that."

19                   Did I read that portion correctly?

20       A.    Yes, you did.

21       Q.    So he didn't tell you that you weren't

22  going to make it through the performance plan.  He

23  just simply said there's going to be higher

24  expectations, and we want to make sure that we're

25  transparent about that?

BROWN, JONATHAN  *  November 21, 2018

Page 444

1      A.      Yeah.  Yeah.  You're right.  He did say

2   that.

3      Q.      Thank you for the audiotape, sir.

4      A.      You're welcome.  But again, why I had to

5   be more and more -- why is it more expectation to me

6   than the norm from my other superiors?  That's the

7   point I was trying to get to.

8      Q.      Well, because, sir, we testified about

9   it, and you even acknowledged earlier in your

10  testimony, there were problems with Geismar I&E;

11  right?

12     A.      Yes.  Problems that I needed them to

13  resolve, and they didn't support me with.

14              And let me make this statement too.

15  As soon as I left, they got exactly what I told them

16  they needed.  That, I know for a fact.  They hired

17  more I&E technicians.

18     Q.      Okay.  Who -- how many I&E technicians

19  did they hire?

20     A.      I don't know.  But I know they did.

21     Q.      Okay.  And how many did they fire?

22     A.      They didn't fire any.  They just got the

23  support that I was begging for the whole time I was

24  there.

25     Q.      Okay.  How many I&E employ -- Praxair

BROWN, JONATHAN  *  November 21, 2018

Page 454

1    him.  That's the part that I don't think they

2    understood, sir.  So, yeah, that's where the

3    miscommunication was.

4        Q.    Okay.  The bottom line was, you were not

5    on the same page --

6        A.    Yes.

7        Q.    -- with your bosses?

8        A.    That's correct.

9        Q.    You also admitted that the -- that you

10   had a bad year in 2015, in that meeting; correct?

11       A.    Yes, we all did.  Yeah, yeah.

12       Q.    No.  Well, no, no.

13             You admitted that you had a bad year

14   during 2015; true?

15       A.    I don't recall.  Clarify that.

16       Q.    Take a look at page 151.  And I quote:

17   "I was doing pretty good.  Then I had a bad year, I

18   would say 2015 wasn't that good.  We had, we had a

19   lot of activities in 2015.  And I know we went over

20   budget.  I mean, it's -- and I understand what

21   you're trying to say, Todd.  I understand what

22   you're relaying here.  I, I've -- that budget, it's

23   a killer for me.  I know that."

24             Did I read that portion correctly?

25       A.    Yes.

BROWN, JONATHAN  *  November 21, 2018

Page 458

```
 1                 So that's what I was trying to
 2     explain there.
 3         Q.    Didn't allow anybody to do that; right?
 4         A.    No.
 5         Q.    Didn't allow the white guys; didn't
 6     allow you; right?
 7         A.    Right.
 8         Q.    It doesn't sound like race
 9     discrimination to me.
10                 MR. JOHNSON:  Object to form.
11         A.    It does to me, sir.
12         Q.    (BY MR. GRIFFITTS)  It does to you?
13         A.    Yeah, because I was the only one that's
14     getting this here because of this.  I'm the only one
15     they're talking about this.  I'm the only one
16     they're putting on a performance improvement plan.
17     Yes, that's why it is to me.
18         Q.    So -- but, to your knowledge, did either
19     of the peers that you mentioned earlier, the other
20     maintenance superintendents, say that the budget was
21     a killer for them, and that they had a bad year in
22     2015?
23         A.    No, they didn't, but -- also, I can
24     state this too, though, sir.  In this here you also
25     heard me tell them almost everything you're
```

BROWN, JONATHAN  *  November 21, 2018

Page 459

1  mentioning to me is an issue with all of us, and

2  they did not disagree with that.

3      Q.    Well, what they said was it was a matter

4  of degree, didn't they?  They told you that nobody's

5  perfect.  In fact, Jim Willis, in this, told you:

6  "Nobody's perfect.  No plant is perfect.  But we're

7  seeing a lot more issues at your plant than we are

8  at the others."

9            That's what he told you, didn't he?

10     A.    That's exactly right.  Because my plant

11  is, like you said earlier, a much older plant, a

12  much aged plant, more units, more of a budget, more

13  work, and, again, not enough resources.

14     Q.    Okay.  Now, one of the things that

15  Mr. Willis told you during the meeting was that he

16  was embarrassed when Samir Serhan came out to the

17  plant and did a walk-through, and the maintenance

18  department was -- the housecleaning was bad, there

19  was guys with grinders and no face shields in the

20  maintenance department.

21            He told you -- do you remember that

22  discussion where he told you he was embarrassed?

23     A.    Yeah, I remember he stated that.

24     Q.    Yeah.

25     A.    Yeah.

APP. 0000108

BROWN, JONATHAN  *  November 21, 2018

Page 460

1      Q.      That's not good, you acknowledge, when

2    your boss's boss tells you they were embarrassed by

3    the condition of your facility; right?

4      A.      Yes, I know.

5      Q.      That's bad?

6      A.      Yes.

7      Q.      And, in fact, he told you that he had

8    previously told you that it needed to be cleaned up,

9    and you said that you had been making walk-arounds

10   and you needed to, I guess, do a little bit better

11   job; right?

12     A.      Yes.

13     Q.      And I'll show you what we'll mark as

14   Exhibit 30.

15              (Exhibit 30 marked/introduced.)

16     Q.      (BY MR. GRIFFITTS)  And ask you if you

17   recognize the photographs that are on that document

18   as photographs of what they appear to be.  They're

19   all labeled.  There's maintenance, storage, I&E, all

20   areas in and around the facility related to

21   maintenance; is that true?

22     A.      Yes.

23     Q.      Okay.  And you'll see that some are in

24   June and some are in July showing either little or

25   no improvement in the lack of cleanliness; true?

BROWN, JONATHAN  *  November 21, 2018

Page 461

1        A.      Yes.

2        Q.      And that was something that was within

3   your control, to ensure that if your boss told you

4   that he was embarrassed, that you get this stuff

5   cleaned up; right?

6        A.      That was in my control in a sense, sir,

7   yes.

8        Q.      Okay.  In what sense did you, as the

9   superintendent of maintenance, not have the control

10  to go tell your guys, "Clean up this shop"?

11       A.      In a sense that we never had time to

12  focus our attention on cleanup, sir.  We were always

13  fighting fires at that plant.  And I explained that

14  to Jim on several occasions.

15              Now, it wasn't a situation where I

16  could say, "Guys, let's just stop doing maintenance

17  and let's just focus on cleanup."

18              It was a challenge for me.  Like I

19  said, again, we just didn't have the resources.

20              Our number one priority at that

21  plant was keeping those units running, and we had

22  six of them.  Six plants there.  And a lot of this

23  stuff you looking at was in the I&E department where

24  I was very, very lacking in resources.

25       Q.      Okay.  And part of your job that

BROWN, JONATHAN  *  November 21, 2018

Page 479

1                   And he came on the weekend.

2          Q.      I've heard this.

3          A.      And my maintenance coordinator was

4      there, and he told me about it.  And I wasn't

5      worried about that as well.  Because -- the reason

6      being is because not only did I have invoices for

7      the work that was performed, I had time sheets for

8      the work that was performed.  I had the

9      requisitions, the requests.  And I had the purchase

10     orders.  And I kept them up to two years.

11                  He didn't know I had those files; so

12     I accounted for every hour, every cent, every dime.

13     I even had rate sheets of the money that they got

14     paid.

15                  But that, he didn't know.  But after

16     he saw that, he had no complaints about it.

17                  So what I was saying is -- what I'm

18     trying to say is a lot of systems I was doing, but

19     if you just ask me for it before you accuse me of

20     it, I can show it to you.

21                  So I got to the point to where I was

22     showing them, "I'm doing this.  I'm doing this.  I

23     did this.  I did that."

24                  So when I was making those

25     statements and agreeing with them, I said, yeah, I

APP. 0000111

BROWN, JONATHAN  *  November 21, 2018

Page 480

1  welcome it.  I welcome the performance improvement

2  plan.  And in my mind-set, I can show you what I'm

3  doing.

4        Q.    Okay.  Well, what you said about Scott

5  Sexton, I understand, because I heard the exact same

6  story on the tape.  I'm not arguing with you about

7  it.

8        A.    Uh-huh.

9        Q.    What Scott Sexton said or didn't say,

10  did or didn't do before, there's no evidence in

11  the -- in the performance improvement plan that

12  anything that was done had anything to do with Scott

13  Sexton; right?

14        A.    No.

15        Q.    Right.

16        A.    No.

17        Q.    So you're complaining about some old

18  issue with Scott Sexton that has nothing to do with

19  the performance improvement plan; right?

20        A.    That -- contractors been on-site, yes.

21  Getting a handle on contractors, that is kind of

22  what that was about, yes, sir.

23        Q.    Okay.  But that can be -- but you

24  were -- you are very fond of telling the story.

25  Well, wait.  Let me finish the question.

BROWN, JONATHAN  *  November 21, 2018

Page 481

1      A.      Okay.  I'm listening.  I'm going to let

2  you finish.

3      Q.      You're very fond of telling the story

4  about how Scott Sexton wrongfully accused you of

5  having contractors that weren't being properly paid

6  and how you showed him he was wrong and you were

7  right.

8              What I'm saying is, Scott Sexton

9  didn't have anything to do with the performance

10 improvement plan; right?

11     A.      No, he didn't.  He didn't, no.

12     Q.      Right.  That's -- okay.

13             And so -- but when it does come to

14 the contract worker issue and the contract labor

15 issue, during the recorded conversation, Mr. Dunn

16 told you that you should -- that you needed to know

17 your budget for materials and contract labor off the

18 top of your head.

19             And you responded, quote, "There's a

20 lot of things I don't remember off the top of my

21 head, especially with budgeting," end quote, didn't

22 you?

23     A.      Yes, sir.  No one knows budgeting off

24 the top of their head.  You have to document numbers

25 for budgeting.

BROWN, JONATHAN  *  November 21, 2018

Page 484

1    top of my head, no.

2         Q.    Okay.  All right.  So between the time

3    that you were placed on the PIE/PIN, April 13th, and

4    you were gone for April and the better part of May.

5    You came back in June.  Between that time and the

6    time you submitted your letter of resignation on

7    July 13, 2016, that's the time frame I'm going to

8    ask you about right now.  Okay?

9         A.    Okay.

10        Q.    So that's that time frame.  From the

11   time you went off on the PIE/PIN to think about it

12   to the time you submitted your letter of

13   resignation.  All right?

14        A.    Uh-huh.

15        Q.    During that time period, you met with

16   Mr. Willis several times, either in person or on the

17   telephone, to discuss performance issues; right?

18        A.    Yes.

19        Q.    And where you stood on the PIE -- on the

20   improvement plan; right?

21        A.    Uh-huh.

22        Q.    Is that a "yes"?

23        A.    Yes.

24        Q.    And during that time, we discussed,

25   because they're on the tape, that he was

BROWN, JONATHAN  *  November 21, 2018

Page 485

1  professional with you in discussing these issues;

2  right?

3      A.     Yes.

4      Q.     He didn't raise his voice or yell at you

5  or call you inappropriate names or anything like

6  that, did he?

7      A.     No.

8      Q.     All right.  And the same is true with

9  respect to Mr. Robnik when you met with him

10  regarding this.  He didn't raise his voice, yell, or

11  call you any inappropriate names, did he --

12      A.     No.

13      Q.     -- during that time period?

14             And the same question regarding

15  Ms. Thomas and Mr. Dunn who had a couple meetings

16  with you in there during that time.  They didn't use

17  inappropriate language towards you, raise their

18  voices at you --

19      A.     No.

20      Q.     -- denigrate you in any way; right?

21      A.     No.

22      Q.     That's true?

23      A.     That's true.

24      Q.     All right.  You felt their expectations

25  regarding what you needed to do to successfully

APP. 0000115

BROWN, JONATHAN  *  November 21, 2018

Page 486

1  complete your job were just not realistic; is that

2  true?

3      A.    The expectation that they were rolling

4  out to me, sir, were being performed by me.  And

5  what was written on that paper, like I said, wasn't

6  accurate, is what I was stating.

7              MR. GRIFFITTS:  Objection.

8          Nonresponsive.

9      Q.    (BY MR. GRIFFITTS)  We know a lot of the

10  stuff wasn't performed by you because we've talked

11  about the work orders.  We've talked about the

12  cleanliness of the plant.  We've talked about

13  the -- that the budget was a killer for you and that

14  you needed to put systems in place to control it.

15  That's what you said; right?

16      A.    Yes.  But, at the same time, I believe

17  that I was targeted.  You can walk into a plant when

18  you're in the middle of a shutdown, you've got a lot

19  of activities going on, which they stated in there.

20  And it's not going to be clean, sir.

21              Now, when everything was done, we

22  were done pulling out materials, done getting these

23  plants up to speed, when we had time to sit down,

24  all our of plants were running, all the turnaround

25  is completed, then y'all take the time to say, "Hey,

BROWN, JONATHAN  *  November 21, 2018

Page 507

1    just told me if I had any information that stood out

2    as to me leaving the company, then -- I think one of

3    the things I mentioned to him was that I left the

4    job because of a -- I didn't feel that I was going

5    to succeed with the performance improvement plan.

6    And I told him about the one about Todd said being

7    transparent.  And that's --

8          Q.    You told him that Todd said, "I just

9    want to be transparent.  You're not going to make it

10   through this program"?

11         A.    Yes.  Yes.  I think I mentioned that,

12   yes.

13         Q.    But as we've -- as we've discovered,

14   that statement, the statement that Todd said he

15   wanted to be transparent that you weren't going to

16   make it through, that really wasn't what Todd said;

17   right?

18         A.    It wasn't an accurate statement, no.

19         Q.    It wasn't accurate; right?

20         A.    Right.

21         Q.    Okay.  Tell me how much you had in --

22   how many times in -- or how long were you -- strike

23   that.

24               How much do you have in travel

25   expenses going back and forth from here to Zachary?

BROWN, JONATHAN  *  November 21, 2018

```
                                              Page 520
 1   information in any employee manual or any other

 2   written document, from the start of your employment

 3   until 2016, that would have contained any

 4   information regarding performance improvement

 5   notifications?

 6        A.    No.

 7              MR. GRIFFITTS:  Objection.  Form.

 8        Q.    (BY MR. JOHNSON)  And a similar

 9   question, when you first began with your employment

10   with Praxair, who was your immediate supervisor --

11        A.    James Willis.

12        Q.    -- in 2012?

13        A.    James Willis.

14        Q.    If you can, please, provide us with what

15   I call the "hierarchy" of persons that would be

16   starting with you.

17        A.    I was maintenance superintendent.  I

18   reported to James Willis, who was the maintenance

19   manager.

20              The director of maintenance at the

21   time, I don't recall who it was, but I knew that he

22   reported to Carlos.  I can't remember his last name.

23              That was the hierarchy.

24        Q.    The maintenance supervisor, that was

25   you.  Above the maintenance supervisor was
```

APP. 0000118

BROWN, JONATHAN  *  November 21, 2018

Page 536

1   Caucasian.

2       Q.     And what was his name?

3       A.     His name was -- let me think here for a

4   minute.  I can't think of it.  But he was the

5   operations superintendent.  It will come to me, but

6   I can't think of it right now.

7       Q.     Did that particular -- is there another

8   plant that would be similar to your Geismar plant

9   that you worked with --

10      A.     No.

11      Q.     -- other than the St. Charles plant?

12             So we're talking about two plants

13  that would be in your basic experience from 2012 to

14  2016?

15      A.     Yes.  Those are the two plants I was

16  responsible for, yes.

17      Q.     And you don't remember the name of the

18  gentleman who was the maintenance superintendent at

19  the St. Charles plant?

20      A.     Well, I was the maintenance

21  superintendent for the St. Charles plant, but he was

22  the operations superintendent.

23      Q.     Okay.  Carlos, what was his race and

24  title?

25      A.     That, I'm not sure.  I think he was

APP. 0000119

BROWN, JONATHAN  *  November 21, 2018

Page 582

```
 1        A.      I don't think it was a team.  I think it
 2   was just an individual.
 3        Q.      Do you remember, was it a lady or guy?
 4        A.      It was a guy.
 5        Q.      All right.  Was he Caucasian or
 6   African-American?
 7        A.      He was Caucasian.
 8                MR. GRIFFITTS:  Objection.  Form.
 9        Q.      (BY MR. JOHNSON)  Do you remember his
10   name?
11        A.      Don't remember his name.
12        Q.      Do you remember when you first
13   interacted with him?
14        A.      Yes.  I think it was Shane.  I'm not --
15   I don't remember his name, no.
16        Q.      Did he interact with you at the plant
17   site?
18        A.      Yes.  He came to the plant site.
19        Q.      Okay.  According to the document, an
20   interview occurred over several hours; is that true?
21        A.      Yes.
22        Q.      And you were given the opportunity to
23   submit documentation to this gentleman with the
24   corporate security team; is that true?
25        A.      Yes.
```

BROWN, JONATHAN  *  November 21, 2018

Page 583

1      Q.      Do you remember what documents you
2  submitted to him?
3      A.      I didn't have many documents at the
4  time, but I was collecting documents.
5      Q.      So now we have two occasions now.  You
6  submitted documents to Ms. Courtni Booker; correct?
7      A.      Yes.
8      Q.      And you submitted, physically, documents
9  to the gentleman that was on the corporate security
10  team?
11      A.      Yes.
12      Q.      All right.  Did that particular
13  individual that was conducting this investigation,
14  did he submit something to you in writing?
15      A.      He did.  I don't recall the details of
16  it -- of everything that he -- he wrote.  I didn't
17  remember it, but I just wanted him to talk to -- I
18  don't know who he talked to.  I wish I had been more
19  involved with his investigation to be -- to
20  understand who he talked to and what questions to
21  ask.
22      Q.      Are you aware of who he spoke with?
23      A.      No.
24      Q.      Are you aware of who he interviewed?
25      A.      No.

BROWN, JONATHAN  *  November 21, 2018

Page 636

```
 1              REPORTER CERTIFICATION
 2   THE STATE OF TEXAS :
     COUNTY  OF  HARRIS :
 3
                I, DENYCE SANDERS, a Certified
 4   Shorthand Reporter and Notary Public in and for the
     State of Texas, do hereby certify that the facts as
 5   stated by me in the caption hereto are true; that
     the above and foregoing answers of the witness,
 6   JONATHAN BROWN, to the interrogatories as indicated
     were made before me by the said witness after being
 7   first duly sworn to testify the truth, and same were
     reduced to typewriting under my direction; that the
 8   above and foregoing deposition as set forth in
     typewriting is a full, true, and correct transcript
 9   of the proceedings had at the time of taking of said
     deposition.
10
                I further certify that I am not, in
11   any capacity, a regular employee of the party in
     whose behalf this deposition is taken, nor in the
12   regular employ of his attorney; and I certify that I
     am not interested in the cause, nor of kin or
13   counsel to either of the parties;
14              That the amount of time used by
     each party at the deposition is as follows:
15
16         MR. GRIFFITTS - 06:08:33
           MR. JOHNSON - 01:35:07
17
18         GIVEN UNDER MY HAND AND SEAL OF OFFICE,
     on this, the 21st day of November, 2018.
19
20   DENYCE SANDERS, CSR, RPR, CRR, TCRR
     Notary Public in and for
21   Harris County, T E X A S
22   My Commission Expires:  4-14-21
     Certification No.:  4038
23   Expiration Date:  12-31-19
     Usher Reporting Services
24   1326 Lochness
     Allen, Texas 75013
25   214.755.1612 - Firm No. 10278
```

APP. 0000122